**In re MURRAY INDUSTRIES, INC., Debtor.**

**Bankruptcy No. 88–7473–8P1.**

United States Bankruptcy Court, M.D. Florida, Tampa Division.

Sept. 11, 1990.

---

249–50; 5 Collier on Bankruptcy, Par. 1329.-01[b] at 1329–4 (15th Ed.1988). See also, *[In re ]* Moseley [B.C.C.D.Cal., 1987], 74 B.R. [791] at 799...."

See also 114 B.R. 749.

John K. Olson, Stearns Weaver Miller Weissler Alhadeff & Sitterson, P.A., Tampa, Fla., for debtor.

Robert B. Glenn, Jr., Glenn, Rasmussen, Fogarty, Merryday & Russo, Tampa, Fla., for Creditors' Committee.

Lynne L. England, Tampa, Fla., Asst. U.S. Trustee.

Wayne Thomas, Carlton, Fields, Ward, Emmanuel, Smith & Cutler, Tampa, Fla., for Joel A. Schleicher.

Wanda Anthony, Trenam, Simmons, Kemker, Scharf, Barkin, Frye & O'Neill, Tampa, Fla., for Chrysler Capital Corp., Chrysler Asset Management Corp., Barnett Bank and Blister Boat claimants.

John W. Kozyak, Kozyak, Tropin & Throckmorton, Miami, Fla., for Merrill Lynch Private Capital.

Allan L. Gropper, White & Case, New York City, for InterRedec.

## ORDER ON MOTION FOR SUBSTANTIVE CONSOLIDATION

ALEXANDER L. PASKAY, Chief Judge.

THIS IS a Chapter 11 case and the matter under consideration is a Motion seeking substantive consolidation of the following estates:

| Name | Case Number |
|------|-------------|
| Murray Industries, Inc. (Industries) | 88–7473 |
| Murray Chris–Craft Aqua Homes, Inc. (Aqua) | 88–7474 |
| Murray Chris–Craft Sportboats West, Inc. (Sportboats West) | 88–7475 |
| Murray Chris–Craft Boat Parts, Inc. (Boat Parts) | 88–7476 |
| Murray Chris–Craft Yachts, Inc. (Yachts) | 88–7477 |
| Murray Chris–Craft Cruisers, Inc. (Cruisers) | 88–7478 |
| Clear Lake Cruisers, Inc. (Lakes Cruisers) | 88–7479 |
| Murray Chris–Craft Fishboats, Inc. (Fishboats) | 88–7480 |
| Murray Chris–Craft Hi–Performance (Hi–Performance) | 88–7481 |
| Murray International Corporation (International) | 88–7482 |
| Murray Transportation Co., Inc. (Transportation) | 88–7483 |
| Murray Boat Administrative Services, Inc. (MBASI) | 88–7484 |
| Murray Chris–Craft Boat Development, Inc. (Boat Development) | 88–7485 |
| Murray Chris–Craft Sportboats, Inc. (Sportboats) | 88–7486 |
| Murray Chris–Craft Sportdecks, Inc. (Sportdecks) | 88–7487 |
| Uniflite, d/b/a Murray Chris–Craft Cruisers West (Uniflite) | 88–7488 |

Each of these entities filed its respective Petition for Relief under Chapter 11 of the Bankruptcy Code on December 9, 1988. Each filed its own Schedule of Assets and Liabilities and Statement of Financial Affairs and Summary of their respective assets and liabilities. The Motion for Substantive Consolidation of the estates of these Debtors is opposed by Merrill–Lynch Private Capital, Inc. (Merrill–Lynch), Joel Schleicher, Citizens & Southern National Bank of Florida (C & S), Louis Karagas, and William Wittenberg.

The facts relevant to the Motion under consideration, as established at the final evidentiary hearing and by the pertinent parts of the general case file of these entities, can be summarized as follows:

### Pre–Petition Historical Background of the Debtors

In 1910, Chris Smith and Johnny J. "Baldy" Ryan joined forces and formed the "Smith–Ryan Boat Co.", and Smith and Ryan remained partners until 1913. The company then became known as the "C.C. Smith Boat & Engine Company." Later, Gar Wood, a boat designer, secured a controlling interest in the company, but the Wood–Smith association dissolved in 1922 and decades of bitter estrangement between Wood and Smith, both celebrated

marine authorities, followed. Once again, Smith's company, now called "Chris Smith & Sons Boat Co." was independent, and Chris Smith and three of his sons each had a 25% interest in the company. By 1924, the company began using the name "Chris–Craft" for a single boat model. In 1930, an option to sell one third of the company to a Wall Street investment firm was negotiated, and the company changed its name to "Chris–Craft Corporation." The Smith family controlled the company stock.

By the early 60's, all the shares in the Chris–Craft Corporation (Chris–Craft) were held privately by 55 people, and the corporation remained as a privately held corporation until 1981. In 1981, G. Dale Murray (Murray), together with Richard E. Genth, F. Lee Bailey, Walter K. Schumacher and Ed McMahon, formed a corporation under the name of Murray Industries, Inc. (Industries), under the laws of the state of Delaware. This newly formed corporation commenced negotiations for the purpose of acquiring two operating divisions of Chris–Craft Cruisers and Sportboats, and to obtain a license and the right to use the Chris–Craft name in boat manufacturing operations.

The two operating divisions were Cruisers and Sportboats, both subsidiaries of

Chris–Craft. Cruisers was formed in 1979 as a Delaware corporation and operated a cruiser manufacturing plant in Holland, Michigan. Sportboats was formed the following year as a Delaware corporation and operated a manufacturing plant for sportboats and fishing boats in Bradenton, Florida. After Industries acquired these subsidiaries, their names were changed to Murray Chris–Craft Cruisers, Inc., and Murray Chris–Craft Sportboats, Inc., and they continued their separate manufacturing operations.

In late 1981, in order to expand its operations into the lower cost boat market, Sportdecks was formed as a Delaware corporation and a subsidiary of Industries to purchase an existing boat manufacturing company in Goshen, Indiana, from Coachman Industries. This entity, which had no previous connection with Industries, continued its separate manufacturing operation.

In 1984 Industries needed additional manufacturing facilities and it purchased Uniflite's operations in Bellingham, Washington, where yachts, cruisers, and sportboats were manufactured for distribution in the western part of the country. In 1984 Industries also purchased a manufacturing plant in Swansboro, North Carolina, and Hi–Performance was incorporated as a Delaware corporation to recognize this separate operation.

In 1985 Mr. Murray, the majority owner of Murray Chris–Craft, obtained a large personal loan from Merrill–Lynch that was secured by a pledge of Murray's shares in the company. As a result of his default on this loan, Merrill–Lynch became the largest minority shareholder of one of the Debtors, Industries. In late 1986, Murray sold a controlling interest in the company to InterRedic, Inc. (InterRedic), which now claims to hold a 79% interest in the Debtor corporations.

After learning about the possibility of insider abuses involving Murray, the Board of Directors of Industries authorized William Batastini of InterRedic to review the financial affairs of Industries and its subsidiaries. As the result of findings based on the review, InterRedic terminated its share-holder agreement with Murray. Shortly thereafter, Murray, Joel Schleicher and others either resigned or were terminated as officers of these corporations by InterRedic. A new management team, which included William Batastini of InterRedic as the chief financial officer of these Debtor corporations, replaced the previous management.

### Organizational Structure of the Debtors

Industries is the parent corporation of fifteen related subsidiary corporations. While Industries and all of the subsidiaries had separate boards of directors, it is fair to state that there was great overlap among the various boards, and most corporate formalities were ignored, at least by the subsidiaries. Essentially, all of the corporations were managed and controlled by Industries and its Board of Directors.

The parent corporation, Industries, headquartered in Bradenton, Florida, functioned in fact as the corporate headquarter for all of the subsidiaries. All of the subsidiaries, except for Cruisers and Sportboats West, were funded by Industries. It appears that Industries made the majority of policy decisions for all of the subsidiaries. The highest-level manager of each of the subsidiaries actually operated out of Industries. All product design, marketing, and other important functions were carried out by Industries in Bradenton. All major contracts of the subsidiaries were negotiated by Industries without the involvement of the local management of any of the subsidiaries.

Some subsidiaries had separate and distinct functions, while other subsidiaries appear to have had no purpose, no assets and no liabilities. Rather, they existed merely as paper corporations. Other subsidiaries played a major role in the overall operation of Industries. For example, one subsidiary, MBASI, operated in the same building as Industries and had a strong impact on all of the other subsidiaries as the financial arm of Industries and all of the subsidiaries. MBASI, as the "central administrator", was in charge of all accounting func-

tions for each company, although each company had its own independent accounting and record keeping system. MBASI maintained two operating accounts and two payroll accounts in Bradenton, Florida. MBASI controlled the cash flow for all the Debtors.

While each subsidiary collected its own accounts receivable, the subsidiaries essentially acted as conduits through which funds for MBASI would flow. MBASI maintained a separate account for each corporation and debited and credited those accounts accordingly. MBASI controlled the general operating account for each of the subsidiaries and paid their bills, including payrolls, with the exception of the payroll of Uniflite which maintained its own payroll. In order to execute this control, the officers and directors of MBASI were also on the Boards of Industries and its subsidiaries. In exchange for services performed by MBASI, it charged Industries and each subsidiary its proportional share of its cost of operation plus a 10% fee and debited each account by that amount. It is important to note that these debits and credits were only transfers on paper and none of these charges were actually paid to MBASI by any of the subsidiaries.

Of the fifteen subsidiaries of Industries, only two were not funded by Industries. One of those subsidiaries, Sportboats West, operated as a sales agent for Uniflite, a subsidiary located in Bellingham, Washington. Uniflite primarily manufactured yachts, cruisers and sport boats for West Coast distribution. Cruisers, the other subsidiary not funded by Industries, manufactured cruisers in Holland, Michigan.

Of the remaining subsidiaries, Yachts manufactured yachts in Swansboro, North Carolina; Sportboats manufactured sport and fishing boats in Bradenton, Florida; and Sportdecks manufactured entry-level Ride–A–Boats in Goshen, Indiana. Research and development for all of the subsidiaries was carried out by Boat Development in Bradenton. Boat Parts supplied replacement parts to dealers and other customers, while Transportation provided transportation and delivery services to the companies.

Several subsidiaries had no assets and no liabilities. These subsidiaries include International, which conducted the foreign sales operation for all the subsidiaries; Lakes Cruisers, which operated in Texas as a retail dealer of boats manufactured by other subsidiaries; and Fish Boats, which primarily manufactured fishing and sport boats. This function was later transferred to Sportboats. The subsidiaries that manufactured high performance catamarans (Hi–Performance) and house boats (Aqua) also had no assets or liabilities.

### Operational History of the Entities Involved

The operations of Industries and its subsidiaries were financed through a line of credit obtained from Barclays American Business Credit, Inc. (Barclays), and later by Perpetual Savings Bank, F.S.B. (Perpetual). The Barclays loan, in the amount of $25 million, was extended directly to Industries, although all of the subsidiaries were joint and several obligors on the loan. (Debtor's Exh. No. 4). That loan was secured by both the tangible and intangible assets of the various companies.

When funds were needed for the operation of the subsidiaries, MBASI called Barclays and requested the necessary funds. The funds received were deposited into one operating account controlled by MBASI. The amount that Barclays agreed to advance was determined by the level of inventory and accounts receivable of all the operating entities. If the inventory and accounts receivable of an entity needing funds fell short of the level required to be eligible for funds, the funds would be advanced to the entity if either one of the other operating entities alone met the inventory and accounts receivable requirements, or if all of the entities combined met the requirements.

In theory, each entity borrowed separately from Barclays and Perpetual. It is without dispute that on the date the Petitions were filed, each of the Debtors' books indicated the outstanding balance each entity

owed to Barclays and to Perpetual. The difficulty in accepting the validity of these balances on the Barclays loan stems from the undisputed fact that between 1981 and 1987 the Debtors did not allocate the liability for these loans to each individual Debtor. Instead, the loan transactions were allocated retroactively in 1987 by the bookkeepers of the subsidiaries. However, they were only able to allocate the loan transactions from 1984 through 1987, and they were unable to determine with any precision how much each Debtor borrowed between 1981 and 1984. It is obvious that the initial loan balances on the subsidiaries' books were established arbitrarily, and the accuracy of the current balances on the books of each operating subsidiary is therefore highly suspect and fails to provide a realistic basis for determining how much each subsidiary owed to Barclays.

The loan from Perpetual was represented by five different notes, all of them guaranteed by most, but not all, of the subsidiaries. The Perpetual loan was also secured by the tangible and intangible assets of all the Debtors. The balances on these notes were recorded on the financial books of the subsidiaries in the same manner as the Barclays loan was recorded.

### Post–Petition Events

As noted earlier, the Debtors filed their respective Petitions for Relief under Chapter 11 on December 9, 1988. Each of the entities filed its own set of Schedules, Statement of Financial Affairs, and Summary of Assets and Liabilities. According to the Summaries submitted by these Debtors, they have the following assets and liabilities:

| Name | Assets | Liabilities |
|------|--------|-------------|
| Murray Industries, Inc. | $11,409,960 | $10,931,863 |
| Chris–Craft Aqua Homes | –0– | –0– |
| Murray Chris–Craft Sportsboats West | 942,616 | 2,042,135 |
| Murray Chris–Craft Boat Parts | 786,753 | 1,322,830 |
| Murray Chris–Craft Yachts | 12,048,388 | 12,000,744 |
| Murray Chris–Craft Cruisers | 11,564,967 | 9,355,902 |
| Clear Lake Cruisers | –0– | –0– |
| Murray Chris–Craft Fishboats | –0– | –0– |
| Murray Chris–Craft Hi–Perf. Boats | –0– | –0– |
| Murray International Corp. | –0– | –0– |
| Murray Transportation Co. | 627,995 | 476,497 |
| Murray Boat Admn. Services | 3,985,001 | 4,572,613 |
| Murray Chris–Craft Boat Develop. | 648,407 | 727,081 |
| Murray Chris–Craft Sportboats, Inc. | 9,891,000 | 16,452,000 |
| Murray Chris–Craft Sportdecks | 9,686,826 | 5,660,183 |
| Uniflite | 10,686,076 | 16,440,044 |

On December 9, 1988, counsel for the Debtors filed an Emergency Motion for Joint Administration of Related Estates. The Motion was scheduled for hearing in due course and on December 29, 1988, this Court entered an Order and authorized the joint administration of the related estates. That Order specifically provided, however, that the joint administration should not be deemed to be a substantial consolidation of the estates, but was merely a procedural consolidation to facilitate the handling of the voluminous papers which were antici-

pated to be generated during the pendency of these Chapter 11 cases.

On January 13, 1989, the Debtors filed an Emergency Motion and sought authority to sell substantially all of the assets of these entities free and clear of liens and to assume and assign certain licensing agreements with Chris–Craft Industries, Inc. (Chris–Craft). On the same date, this Court entered an Order which scheduled a hearing on the emergency Motion, established the manner and method for noticing the same, and fixed a schedule for objec-

tions to the proposed sale. On February 4, 1989, a hearing on the emergency motion was held.

At the beginning of the hearing on the Motion To Sell, counsel for the Debtor announced that the initial high bid of $6 million was unacceptable, and he requested time to consider additional offers which apparently were ready to be presented. The request was granted, and the Court took a recess in order to permit interested parties to freely make their bids without any involvement by this Court. After recess, counsel for the Debtor recommended the approval of the sale of the tangible and intangible assets of the Debtors, except for Cruisers' plant in Holland, Michigan, and the Uniflite plant in Bellingham, Washington, and the assignment of the Chris-Craft License Agreement to Outboard Marine Corporation (OMC). The purchase price was $53 million cash and a deferred payment represented by a promissory note, the amount of which was based on the volume of boat sales by OMC over a five-year period, bringing the total sales price, estimated to be $63 million.

Prior to the approval of the sale, this Court expressed its misgivings and stated its concern about the propriety of the proposed sale because it appeared to be a de facto substantive consolidation of the Debtors' estates in complete disregard of the procedural requirements for such a consolidation. This concern was based primarily on the fact that there was no allocation of the purchase price between the several entities whose assets were involved in the sale. Further, there was no determination of how much each entity would contribute to the monies needed to pay off the secured debts owed to Barclays and Perpetual.

In response to the Court's concern, counsel for the Debtors stated that the Debtors' cash position had reached the critical stage; the approval of the sale was imperative and any delay would have a disastrous impact on the Debtors' chances to reorganize. Moreover, counsel for the Debtors urged that the proposed sale did not accomplish substantive consolidation at all. He noted, however, that the Debtors were structured as one entity and that they had always operated as one single entity. (Tr. at p. 36 at the hearing on the proposed sale, February 4, 1990). Notwithstanding, counsel for the Debtors stated that he was not suggesting that the purchase price should go into "one pot", never to be allocated between the Debtors, although he noted that it might be appropriate ultimately to substantively consolidate all of the estates.

The proposed sale was initially objected to by the Official Creditors Committee; by counsel for Murray, the former chairman of the board and chief executive of these entities; by the two major secured creditors, Barclays and Perpetual; by Merrill-Lynch and Schleicher, a former officer of Industries; and by numerous other parties of interest. The objections were based primarily on the fact that the purchase price offered by OMC was insufficient because the assets to be sold had a greater value than the purchase price. Merrill-Lynch and Schleicher also complained that the proposed sale, if approved, would result in a substantive consolidation of the estates of these entities by failing to allocate the purchase price among the several Debtors. In this connection, it should be pointed out, as noted earlier, that Murray's stock in Industries was pledged to Merrill-Lynch, and Merrill-Lynch had exclusive right to vote the stock during the period of pledge. Schleicher, a former executive of Industries, admittedly has no claim against any of the subsidiaries and has a claim only against Industries.

At the conclusion of the hearing, this Court announced that the offer submitted by OMC was an excellent offer and represented a purchase price which far exceeded anybody's expectations; that the bidding was conducted fairly; that the bidders were given sufficient factual information concerning the assets to be sold; that the bidding was not collusive and, therefore, it was appropriate to approve the sale. Accordingly, this Court entered an Order on the same day and authorized the sale of the assets to OMC. There was no notice of appeal taken from this Order and in due course the sale was ultimately consummated.

As noted earlier, the assets sold to OMC free and clear of liens was encumbered in favor of Barclays and Perpetual. While initially there was some disagreement as to how the purchase price should be allocated between Barclays and Perpetual, the matter was ultimately resolved. On May 17, 1989, this Court entered an Order which provided that Barclays was to receive $17 million and Perpetual was to receive $24 million out of the purchase price in full satisfaction of their secured claims. Soon thereafter, this Court entered an Order approving the sale of surplus land owned by Industries which was next to the Holland, Michigan, facilities.

On November 30, 1989, the Debtors filed a single disclosure statement and joint plan of reorganization for all entities. The hearing on the disclosure statement was held on January 19, 1990. The Creditors' Committee filed an objection to the disclosure statement, as did other parties of interest. On February 9, 1990 this Court entered an Order and sustained the objections, disapproved the disclosure statement, and directed the Debtors to file an amended disclosure statement by February 19, 1990.

On February 20, 1990, the Debtors filed an amended plan and disclosure statement. In due course, a hearing was scheduled to consider the amended disclosure statement, the legal sufficiency of which was challenged by Merrill–Lynch, Schleicher, and some other parties of interest. On May 1, 1990, this Court entered an Order and deferred ruling on the objections to the amended disclosure statement until the issue of substantive consolidation could be resolved. On March 12, 1990, the Debtors filed their Motion for Substantive Consolidation, joined by the Official Committee of Unsecured Creditors and InterRedic, and the owner of the majority of the stock of Industries.

In support of their Motion for Substantive Consolidation, the Debtors and the Official Creditors Committee contend that creditors in general dealt with the Debtors as one single enterprise. Further, they argue that considering the difficulty and expense of allocating the assets of these Debtors and separating their financial affairs, it would be impracticable, inequitable, and expensive to require the separate administration of these Debtors and, therefore, substantive consolidation is justified for the purpose of reorganization. In addition, the Debtors contend that the sale to OMC was a sale of the assets of all the Debtors to the extent that they had any, and that OMC insisted there should be no allocation of sale proceeds because it would be impossible due to the nature of the assets sold. In addition, according to counsel for the Debtors, it is impossible to determine the respective liabilities of the several subsidiaries on the Barclays and Perpetual loans, which liabilities were not only guaranteed by the subsidiaries, but whose assets were also pledged as security for these loans—the assets which were later sold to OMC. Based on the foregoing, according to counsel for the Debtors, it would be pure speculation to decide how much each subsidiary should pay out of its share of the purchase price to satisfy the Barclays and Perpetual obligation.

The substantive consolidation is now actively opposed only by Merrill–Lynch and by Schleicher. Their objections are, of course, easily understandable in light of the fact that if there is no substantive consolidation, Schleicher would most likely obtain a full satisfaction of his claim, but if there is a substantive consolidation, he would certainly receive substantially less. Similarly, Merrill–Lynch's chances to fully recover its equity security interest would be assured if there is no substantive consolidation because without substantive consolidation, Industries is solvent. Under this scenario, Merrill–Lynch successfully could oppose any plan of reorganization unless the plan complies with the requirements of § 1129 of the Bankruptcy Code and provides full satisfaction to the equity security interest held by Merrill–Lynch.

*General Legal Principles Governing Substantive Consolidation*

Before applying the legal principles which govern substantive consolidation to the facts as established at the final evidentiary hearing, it should be pointed out that

the following subsidiaries have no assets and have no liabilities: Aqua Homes, Cruisers, Fishboats, Hi–Performance Boats, and International. Thus, the propriety to include these entities in the substantive consolidation is without significance and is academic. This leaves for consideration whether or not under the controlling legal principles it is appropriate to order substantive consolidation of the subsidiaries who have assets and liabilities with Industries.

It should be noted at the outset that there was nothing in the Bankruptcy Act of 1898, nor is there now anything in the Bankruptcy Code, which specifically authorizes substantive consolidation of separate estates. On the other hand, it is equally true that there is nothing which prohibits substantive consolidation under appropriate circumstances. It is well established by now that substantive consolidation of several estates may be appropriate and authorized based on the general equitable powers of the Bankruptcy Code. *In re Continental Vending Machine Corp.*, 517 F.2d 997 (2d Cir.1975), *cert. denied*, 424 U.S. 913, 96 S.Ct. 1111, 47 L.Ed.2d 317 (1976). Thus, as early as 1940, the Tenth Circuit in the case of *Fish v. East*, 114 F.2d 177 (10th Cir.1940), recognized the power to substantively consolidate estates.

In the case of *Stone v. Eacho*, 127 F.2d 284 (4th Cir.1942), *cert. denied*, 317 U.S. 635, 63 S.Ct. 54, 87 L.Ed. 512 (1942), the Fourth Circuit reversed the lower court's decision which denied a motion to substantively consolidate a parent and a subsidiary, both of whom were debtors under the Bankruptcy Act of 1898. In this case, the Court of Appeals noted that the courts will not be blinded by corporate forms, and consolidation may be permitted in order to hold a parent corporation liable for debts created by an insolvent subsidiary which was merely operated as an instrumentality of the parent.

The seminal case in this area is *Chemical Bank N.Y. Trust Co. v. Kheel*, 369 F.2d 845 (2d Cir.1966), where the Second Circuit held that substantive consolidation is proper only under three circumstances:

1. Assets of an affiliate had been transferred fraudulently.

2. Creditors relied on the credit of a consolidated group rather than the credit of a particular affiliate.

3. Creditors of a debtor could successfully assert claims against an affiliate on alter-ego grounds.

The Second Circuit again revisited the question of substantive consolidation in the case of *In re Flora Mir Candy Corp.*, 432 F.2d 1060 (2d Cir.1970). In *Flora Mir*, the court concluded that substantive consolidation should not be granted as a matter of administrative convenience when substantive rights are adversely affected, but substantive consolidation may be appropriate in cases even though some creditors may be adversely affected.

In the case of *In re Commercial Envelope Mfg. Co., Inc.*, 14 C.B.C. 191, 3 B.C.D. 647 (S.D.N.Y.1977), the court noted that while creditors may be adversely affected by substantive consolidation, that is not controlling and the bankruptcy court must consider whether the conflicting interests may be balanced in such a way as to reach a rough approximation of justice to some, rather than to deny justice to all, *citing* Judge Friendly in *Chemical Bank, supra*. The early cases dealing with substantive consolidation basically centered around the traditional common law philosophy which focused on the interrelationships of a group, which, if they were found to be hopelessly obscured, and if it appeared the time and expense necessary to attempt to unscramble them was so substantial as to threaten the realization of any net assets for all the creditors, equity is not helpless to reach a rough approximation of justice to some rather than deny any to all. *Chemical Bank, supra.*

The modern trend which is more liberal was best stated in the case of *In re Vecco Constr. Industries, Inc.*, 4 B.R. 407 (Bankr.E.D.Va.1980). In *Vecco*, the court noted that the liberal trend in allowing substantive consolidation has its genesis in the increased judicial recognition of the widespread use of interrelated corporate structures by subsidiary corporations oper-

ating under a parent entity's corporate umbrella for tax and business purposes. In *Soviero v. Franklin National Bank*, 328 F.2d 446 (2d Cir.1964), the bankruptcy court made clear findings of commingling of assets and functions of the corporate entities affiliated with the debtor, and a flagrant disregard of corporate formalities, including the same shareholders and directors, no corporate minutes, no working capital in subsidiaries, arbitrary allocation of inventory and expenses, and parent guarantees of subsidiary obligations. Moreover, creditors were advised that the bankrupt was a "consolidated enterprise" and creditors received consolidated financial statements listing assets of the affiliated companies as those of the bankrupt.

In *In re Richton International Corp.*, 12 B.R. 555 (Bankr.S.D.N.Y.1981), the court relied heavily on the creditor reliance theory espoused in *Soviero*. There, the court noted:

> the debtors operated as a single business entity; significant operational and policy decisions respecting the debtors were made and implemented by the parent of the debtor corporations; funds were shifted between the debtors to provide for operating expenses; the debtors filed consolidated federal tax returns; and there were extensive cross corporate guarantees of bank and trade obligations. "What is present in this case is a situation akin to what was found by the court in the *Soviero* case, that many creditors dealt with [the debtor corporations] as one entity."

Significantly, the court stated that no evidence was presented to indicate creditor reliance on the separate credit of any subsidiary. Also, the court determined that consolidation would yield "an equitable treatment of creditors without any undue prejudice to any particular group."

Under the liberal approach, it is now commonly understood that substantive consolidation may be authorized whenever it will benefit the debtors' estates without betraying legitimate expectations of the debtors and their respective creditors. The existence of the factors in *Fish v. East*,

*supra, Chemical Bank v. Kheel*, and others, or the often cited seven elements (see *infra*) merely facilitates the balancing of equity of the parties affected. However, there is no clear litmus test for determining substantive consolidation, and cases are to a great degree sui generis, 5 *Collier on Bankruptcy*, note 1, 1100.06[1] at 1100–33, cited in *In re Augie/Restivo Baking Co.*, 860 F.2d 515 (2d Cir.1988).

 Notwithstanding the modern trend, it is still recognized that substantive consolidation in almost all instances threatens to prejudice the rights of some parties. *In re Coventry Energy Corporation*, 5 B.C.D. 98 (Bankr.S.D.Ohio 1979). Thus, it appears from the foregoing that before substantive consolidation is permitted, the Court must conduct a searching inquiry to insure that consolidation yields benefits offsetting the harm it inflicts on objecting parties. *In re Snider Bros., Inc.*, 18 B.R. 230, 237–38 (Bankr.D.Mass.1982). Clearly, the party seeking substantive consolidation has the burden to establish, inter alia, not only that there is substantial identity between the entities to be consolidated, but also that consolidation is necessary to avoid some harm or realize some benefit.

As noted in *Flora Mir Candy, supra*, while substantive consolidation has a disarmingly innocent sound, consolidation in bankruptcy is no mere instrument of procedural convenience, but instead it is a measure vitally affecting substantive rights. This is so because separate debtors have different ratios of assets to liabilities and some among the several entities may be solvent while others may not be. As the result, the creditors of a solvent corporation might rightfully expect a larger return on their claims than creditors of the insolvent entities, if substantive consolidation is denied.

 In sum, the remedy of substantive consolidation is appropriate, notwithstanding the foregoing, when it has been shown that the possibility of economic prejudice which would result with continuing corporate separateness outweighed the minimal prejudice that substantive consolidation might cause. There is no one set of

elements that mandates consolidation. It is clear that cases in which substantive consolidation might be appropriate are "sui generis", and the formula developed to analyze these cases has always been "tailored to the unique fact pattern of the case involved." *DeWitt Truck Brokers v. W. Ray Flemming Fruit Co.*, 540 F.2d 681 (4th Cir.1976); 5 *Collier on Bankruptcy*, 110.-06[1]. As noted in the case of *In re Donut Queen, Ltd.*, 41 B.R. 706, 709 (Bkrtcy.E.D. N.Y.1984), before substantive consolidation is authorized, the Court will have to consider a seven-part objective inquiry into the interrelationship of the entities to be consolidated. These seven factors are:

1. The presence or absence of consolidated financial statements.

2. The unity of interests and ownership between various corporate entities.

3. The existence of parent and intercorporate guarantees on loans.

4. The degree of difficulty in segregating and ascertaining individual assets and liabilities.

5. The existence of transfers of assets without formal observance of corporate formalities.

6. The commingling of assets and business functions.

7. The profitability of consolidation at a single physical location.

It appears from the foregoing that under the modern trend, mechanical application of the test in *Chemical Bank, supra,* no longer represents the currently prevailing view on the subject. For instance, in the case of *In re Richton International Corp., supra,* the entities kept separate books and records, and the debts between the companies could have been unscrambled without great difficulty. Notwithstanding, in approving substantive consolidation, the court concluded that the companies were operated as one general enterprise under the complete control of the parent. In *Richton,* the loan agreements between the Parent and the lenders involved the bank's lending money to the parent who would in turn then downstream the borrowed funds to the subsidiaries. The subsidiaries guaranteed the obligation of the parent, and the parent in turn guaranteed the debt of all of the subsidiaries. Thus, notwithstanding the ability of each company to separately categorize its particular creditors, the court found that substantive consolidation was appropriate under the facts involved.

In the case of *Augie/Restivo Baking Co., supra,* the Second Circuit considered to what extent it is appropriate to consider the impact on the stockholders' interest if substantive consolidation is ordered. The court noted that the basic purpose of the Bankruptcy Code was to assure an equitable sharing among creditors and not stockholders and that the sole purpose of the substantive consolidation is to insure the equitable treatment of all creditors. There is no doubt that equity security holders have a stake in the Debtors' corporation in which they have an interest. However, no one can deny that in the entire scheme of a Chapter 11 distribution, equity security holders enjoy the lowest rank and under the fair and equitable test required by Section 1129(b)(1), their interest is subordinated to the interest of creditors.

Considering the prepetition history of these subsidiaries and their status as reflected by the schedules filed in this case, it appears at first blush that it is not difficult to determine the assets and the liabilities of each of the entities, especially if one accepts the book values of the assets which are involved in the sale to OMC. However, the separate record keeping of the entities is just a point of beginning of the inquiry and the ultimate question is whether or not it is fair to authorize substantive consolidation after having balanced the equities in light of the record in this case.

As noted earlier in this case, there was total unity of ownership wherein the parent owned and controlled all the subsidiaries. The entire operation of all entities was financed by two secured loans, one by Barclays and one by Perpetual, and while the loans were granted to Industries, they were guaranteed by most all, if not all, the subsidiaries. (Debtor's Exh. No. 4). While it is true that the books of each of the Debtors reflected a separate balance for

each loan, these balances were incomplete simply because between 1981 and 1987, there was no fair and precise allocation of the liability resulting from the borrowing between the individual Debtors.

The arbitrary manner in which the loans were allocated assumes an even greater significance when one considers that the sale to OMC of the assets of all the subsidiaries which had assets was approved. These hard assets included buildings, land, equipment, walls, plugs, and more. The hard assets of all the entities who had hard assets were sold to OMC and were valued at approximately $21 million. However, this could be easily allocated among the subsidiaries based on book values. Thus, how much of the $21 million obtained from the sale for the hard assets could be allocated by the several subsidiaries presents no real problem.

The difficulty with allocation arises from the fact that the major portion of the purchase price paid by OMC is not for the hard assets but is instead for the intangibles, particularly, for the right to use the Chris–Craft name in the only viable economic endeavor of the operating entities, that is, in manufacturing pleasure crafts of various models under the well-known name of Chris–Craft, technically because the Chris–Craft Licensing Agreement was granted only to Industries and not to the subsidiaries. Moreover, in addition to acquiring the Chris–Craft Licensing Agreement, OMC also purchased other intangibles such as the dealer network; the good will generated by the use of the name, Chris–Craft; and the going concern value of the manufacturing plants, plants' brochures, and advertising materials, all of which were owned by the Debtors other than Industries. Since the major portion of the purchase price received from OMC clearly represented the purchase price of intangibles, the question remains whether or not it is fair to permit Industries to receive that amount just because Industries alone owned the Chris–Craft Licensing Agreement. In addition, to value each of these assets and allocate them among the subsidiaries would well nigh be an impossible task, unless one resorted to the same arbitrary allocation method which was used to establish the liabilities of the subsidiaries on the Barclays and Perpetual loans. It certainly would not be fair under the facts as established on this record.

There are other factors which must be considered. There were numerous intercompany exchanges of funds and properties among the several subsidiaries. While these transfers were recorded on the respective books and records of the subsidiaries involved and recorded as debits and credits, it is without dispute there was never a reconciliation and none of the subsidiaries paid for these transfers. Thus, obviously if there is no substantive consolidation, there has to be determined the proper outstanding balance owed by one subsidiary to another asserted on the one hand as receivable against another as it is payable and this process which appears to be complex, costly and time-consuming, would in addition have the negative impact on the legitimate claims of traders who dealt with a particular entity which might turn out to be heavily indebted to another subsidiary.

Lastly, it is clear that the Debtors basically operated and functioned practically as a single economic unit and at least, without doubt, functioned as such for the purpose of institutional borrowings, that is, the loans obtained to finance the operation of the entire group to the loans obtained from Barclays and Perpetual. For example, the Debtors published one single consolidated financial statement for each of their operating years, and all information contained in this statement was generally available to the public at large. All audits performed by outside services were done on a consolidated basis. While it is true that operating subsidiaries might have had independent Dun & Bradstreet reports, the fact remains that in terms of the financial reporting reflecting the economic strength of the group, all these Debtors were held out as one operating group, not fifteen separate independent corporations, all standing independently from the parent, Industries.

As noted earlier, a substantive consolidation invariably affects adversely some interests, but this fact alone would not neces-

sarily present an obstacle to prevent the granting of a Motion for Substantive Consolidation. As stated in the case of *In re Commercial Envelope Mfg. Co., Inc., supra,* the fact that while creditors may be adversely affected by a substantive consolidation, this alone is not controlling and the bankruptcy court must weigh the conflicting interests which should be balanced in such way as to reach a rough approximation to some rather than to deny justice to all.

In the present instance, the harm which may result from substantive consolidation is the harm visited on Merrill–Lynch and Schleicher. As noted, Merrill–Lynch claims to be an equity security holder. While equity interest security holders are parties of interest, it is a generally accepted proposition that equitable sharing for the purpose of the Bankruptcy Code means an equitable sharing among creditors, not stockholders. *See Augie/Restivo Baking Co., supra.*

In the overall scheme of things, the interest of Merrill–Lynch, as noted earlier, is of the lowest rank in the context of a Chapter 11. Thus, in the last analysis, the equity clearly favors the *entire* creditors' constituency over the interest of the equity security interest holders. The other objecting party is Schleicher, whose interest must also be balanced against the interest of the entire body of creditors. As noted earlier, the Official Creditors Committee supports substantive consolidation. In light of this, this Court is satisfied that in balancing the equities, they weigh heavily in favor of the creditors' constituency and against Schleicher, who was an insider.

One last comment. There is also support for the proposition that where consolidation facilitates and expedites the reorganization process involving several related debtors, substantive consolidation may be authorized, as separate plans of reorganization would not be feasible. In *In re F.A. Potts & Co.,* 23 B.R. 569 (Bankr.E.D.Pa.1982).

In the present instance, in light of the fact that more than 4,255 claims have been filed, several of them against all or several different estates, it would be extremely difficult and well nigh impossible to formulate a separate plan of reorganization until all these claims are sorted out and, most importantly, the intercompany debits and credits are settled. In light of this tremendous logistical problem, in this Court's view, the most sensible approach is to permit substantive consolidation.

Having considered the overall picture and not only the organizational structure of these entities, their prepetition operations, together with the results of the most significant postpetition event, that is, the sale of the assets to OMC, this Court is satisfied that by applying the legal principles enunciated, including balancing the equities among the objecting parties and all creditors involved, together with the overall fairness of the results which may be produced by substantive consolidation, the only proper course of action is to grant the Motion. Although Citizens & Southern National Bank of Florida (C & S), Louis Karagas, and William Wittenberg also filed objections to the Joint Motion for Substantive Consolidation, C & S withdrew its objection and neither Karagas nor Wittenberg ever presented anything in support of their respective objections.

Accordingly, it is

ORDERED, ADJUDGED AND DECREED that the Motion for Substantive Consolidation be, and the same is hereby, granted and the Debtors are permitted and authorized to file one single disclosure statement and one single plan of reorganization for the entity for which it appears to be appropriate to do so. It is further

ORDERED, ADJUDGED AND DECREED that the Objections filed by Merrill–Lynch Private Capital, Inc., and Joel Schleicher be, and the same are hereby, overruled. It is further

ORDERED, ADJUDGED AND DECREED that the Objections of Louis Karagas and William Wittenberg be, and the same are hereby, overruled.

DONE AND ORDERED.