In re ORFA CORPORATION OF PHILADELPHIA, Debtor.

In re ORFA CORP. OF AMERICA, Debtor.

In re ORFA CORPORATION OF AMERICA (DEL.), Debtor.

BRUCE ENERGY CENTRE LIMITED, Plaintiff,

v.

ORFA CORP. OF AMERICA, Orfa Corporation of America (Delaware), Orfa Corporation of Philadelphia Robert S. Taylor, Trustee, Euro American Financial Corporation, Euro American Capital Corporation, and Corsair Asset Management, Inc., Defendants.

Bankruptcy Nos. 90–11253S, 90–11254S, 90–11255S. Adv. No. 90–0954S.

United States Bankruptcy Court, E.D. Pennsylvania.

July 2, 1991.

Louis H. Pollak, U.S. Dist. Court, Philadelphia, Pa., for the Eastern District of Pa.

Robert S. Taylor, Lewis, Eckert, Robb & Co., Plymouth Meeting, Pa., Trustee.

Warren Pratt, Drinker Biddle & Reath, Philadelphia, Pa., for Bruce Energy Center, Ltd.

Karen L. Turner, Philadelphia, Pa., for Security Pacific.

Matthew H. Krekstein, Schwartz & Krekstein, Philadelphia, Pa., for Creditors' Committee.

Michael L. Temin, Wolf, Block, Schorr & Solis–Cohen, Philadelphia, Pa., for Licensees.

James J. O'Connell, Asst. U.S. Trustee, Philadelphia, Pa., U.S. Trustee.

Christopher Kuhn, Silberman, Markovitz, Meo & Raslavich, Philadelphia, Pa., for Trustee.

Allen B. Dubroff, Gary P. Lightman, Astor, Weiss & Newman, Philadelphia, Pa., for debtor.

Jeffrey Kurtzman, Klehr, Harrison, Harvey, Branzburg, Ellers & Weir, Philadelphia, Pa., for Bondholders.

Frederick D. Lipman, Earl M. Forte, Blank, Rome, Comisky & McCauley, Philadelphia, Pa., for Euro American Financial Corp.

## OPINION

DAVID A. SCHOLL, Bankruptcy Judge.

### A. INTRODUCTION

Presently before us for disposition are the following related matters arising out of the case of three related Debtors holding certain valuable licenses of a process for recycling solid waste: (1) confirmation of the Second Amended Consolidated Plan of Reorganization ("the Plan") filed by Euro American Financial Corp. ("EAFC") and Corsair Asset Management, Inc. ("Corsair") (collectively "the Plan Proponents" or "the Proponents"); (2) an adversary proceeding instituted by Bruce Energy Centre, Inc. ("BEC") under 11 U.S.C. § 506 to determine the nature and extent of its claim ("the Adversary"); (3) a Motion of BEC for relief from the automatic stay ("the BEC Motion"); (4) a Renewed Motion of Security Pacific National Bank ("SPNB") for relief from the stay ("the Remand Motion"); and (5) a recently-filed Motion of SPNB to convert this case to Chapter 7 ("the Conversion Motion").

We hold that the Plan cannot be confirmed for the following reasons: (1) it fails to provide an adequate "market rate" of interest to SPNB, which we conclude must be no less than two (2%) percent above the prime rate; (2) it improperly combines what we conclude, in deciding the adversary proceeding, are secured claims of BEC in the same class as unsecured claims; and (3) it apparently fails to provide for sufficient payments to cure the delinquencies owed to Jetzer Technologie, B.V. and Organ–Faser Technology, the licensors of the Debtors' recycling process

("the Licensors"), to permit assumption of the executory Licensing Agreement of this process. In so concluding, we reject the following objections to confirmation: (1) the Plan improperly seeks to substantively consolidate the three Debtors' cases; (2) the Plan improperly places all claims of SPNB, including both secured and potential unsecured claims, in a single class; and (3) the Plan is infeasible.

Since preparation of a further Amended Plan, which cures the enumerated defects, seems within the Proponents' grasp, the motions of BEC and SPNB seeking relief from the automatic stay and that of SPNB seeking conversion are denied upon the condition that the Proponents (or any other interested party) promptly file a further Amended Plan curing the enumerated defects, with an accompanying Amended Disclosure Statement, and promptly pursue same to confirmation.

## B. PROCEDURAL HISTORY

The filing of voluntary Chapter 11 bankruptcy petitions by instant Debtors, ORFA CORP. OF PHILADELPHIA ("ORFA-PHIL"), ORFA CORP. OF AMERICA ("ORFAM"), and ORFA CORPORATION OF AMERICA (DEL.) ("ORFADEL"), began in a controversy regarding the composition of the Debtors' Boards of Directors and the legitimacy of the Boards' right to file these cases, which is described in an Opinion of this court of June 20, 1990, and an Order of July 20, 1990, reported at 115 B.R. 799 ("*Orfa I*"). On November 21, 1990, we filed an Opinion in which we denied SPNB's Motion for appointment of additional creditors' committees, which is reported at 121 B.R. 294 ("*Orfa II*"). In that Opinion, we noted that the Debtors' incumbent management failed in their efforts to keep the Debtors afloat. *Id.* at 295-97. We further described how the mantle of reorganization was then taken up by the Proponents, one of which (EAFC) was one of two groups of investors who lost the original skirmish with the incumbents. *Id.*

Although we refer the reader to *Orfa I* and *Orfa II* for detailed histories of the cases through November 21, 1990, we reiterate our description of the three Debtors and the principal players set forth in *Orfa II* as follows, 121 B.R. at 296:

> (1) ORFAM—the parent company, whose Board ran all three Debtors and which paid management's salary; (2) ORFA-DEL—the holder of two potentially valuable licenses to operate the allegedly ingenious Orfa waste disposal system in the Western Hemisphere; and (3) ORFA [PHIL] ... the owner of a now-non-functioning Orfa plant constructed in southwest Philadelphia. SPNB financed the construction of the plant and hence has a first mortgage on the real estate where it is located and its improvements. BEC [, the second of the two groups of investors, with EAFC,] was and apparently remains interested in acquiring licensing rights to construct an Orfa plant in Toronto, Canada.

The first of the matters before us to be filed was the Renewed 362 Motion, filed on November 5, 1990. The BEC Motion was filed on December 3, 1990. Both of these Motions were consolidated with a hearing to consider confirmation of the Plan on December 19, 20, and 21, 1990. Briefing on these matters was originally completed on January 25, 1991.

The Adversary was filed on December 17, 1990. Before it was listed for trial, the first of a series of conferences to attempt to aid the parties in attempting to negotiate a consensual plan was listed before the Honorable Judith H. Wizmur of the District of New Jersey on January 25, 1991. Ultimately, the record in the Adversary was made in testimony of February 20, 1991, and from a factual Stipulation of the parties filed on March 1, 1991.

This court, Judge Wizmur, and the parties had high hopes for settlement. On several occasions, SPNB and the Proponents, the primary protagonists, reported that they were very close to a resolution. However, for reasons of which this court is unaware due to our calculated distance from discussion of the substance of the negotiations before Judge Wizmur, no con-

sensual plan materialized. A final deadline of June 5, 1991, passed without finalization.

In the mean time, on May 25, 1991, SPNB filed the Conversion Motion. The additional record on that Motion was the subject of brief testimony on June 5, 1991, and several stipulated facts. Incorporated into the record were the records of the hearing of August 30, 1990, on SPNB's original stay-relief motion; the hearing of September 12, 1990, on the Trustee's unsuccessful motion to sell ORFADEL's license rights to BEC; a hearing of September 28, 1990, on SPNB's original 362 Motion; the hearing of November 14, 1990, on the motion at issue in *Orfa II, see* 121 B.R. at 296; and a hearing of October 5, 1990, on a successful motion by the Trustee for a preliminary injunction in Adversary No. 90–0753S ("Adv. 90–753"), to prevent BEC from seizing Canadian sub-licenses of the Orfa process.

On June 5, 1991, this court, recognizing a significant lapse in time since the briefing was initially completed in January, gave SPNB and BEC until June 12, 1991, to file Briefs in support of the previously-unbriefed Conversion Motion and the Adversary, respectively. All interested parties were accorded until June 19, 1991, to file any responses or additional submissions of any sort.

The parties must be "briefed out." After receipt of the Briefs from SPNB and BEC referenced above, all that we received on June 19, 1991, was a one and a half page letter from the Proponents responding the BEC's submission relating to the Adversary.

At the close of the consolidated trial on December 21, 1990, SPNB and BEC stipulated that the automatic stay would remain in place, in accordance with 11 U.S.C. § 362(e) and Bankruptcy Rule 4001(a)(2), for 30 days after the submissions of the parties were originally due on January 25, 1991. Being concerned about the potential effect of § 362(e) as settlement negotiations before Judge Wizmur proceeded into March, we entered an Order of February 21, 1991, continuing the stay in effect "pending a final decision in all matters before us in the ... hearings" concluded on December 21, 1990. This Order, plus the Order in *Orfa II,* and perhaps other matters, are on appeal to the district court, although these matters were apparently also "on hold" until June 5, 1991, pending the prospect of a global settlement.

## C. FACTUAL HISTORY

It would exhaust reams of paper, serve little benefit, and be contrary to the parties' need for a prompt decision of the matters before us to begin this Opinion with a classic review of all testimony and evidence at the prior hearings and express findings as to each disputed point. Except for the single Adversary, which consists largely of a paper record, the matters before us are motions, which we do not believe necessitate strict compliance with the dictates of the first sentence of Federal Rule of Civil Procedure 52(a). *See In re Campfire Shop, Inc.,* 71 B.R. 521, 524–25 (Bankr.E.D.Pa.1987). We do, of course, intend to present a sufficient discussion of all points decided to allow meaningful review. *See In re Garrett Road Supermarket, Inc.,* 95 B.R. 906, 908–09 & n. 2 (E.D.Pa. 1989).

The most important "fact" at issue requiring some description is the Plan. Although the Debtors have never been formally consolidated, the Plan, for the most part, treats the creditors of each of the Debtors as one body, *i.e.,* as if their cases were consolidated. Nevertheless, in a paragraph addressing "revesting of assets," the Plan provides that the Debtors will operate as separate entities post-petition.

All secured and unsecured claims of SPNB are placed into a single class. SPNB is to receive full payment on the effective date if the Proponents obtain financing sought from Chase Manhattan Bank, N.A. ("Chase"). If the Chase loan is not consummated, as has not occurred to date, the Proponents, who are investment brokers and counsellors by profession, will undertake a private placement of preferred stock of the Debtors. From the proceeds of this placement, which, according to the

Proponents, cannot be effected until the plan is confirmed, SPNB will be paid interest "at the prime rate" and will receive a final balloon payment after ten years of $8,225,000, which is about $150,000 greater than SPNB's $8,072,065.76 Proofs of Claim as of the bankruptcy filings (No. 135 in the ORFAM case and No. 23 in the ORFADEL case).

BEC's claim, though apparently admittedly secured by ORFADEL's stock, is placed into a class (Class H) including unsecured noteholders and all other unsecured claims of the Debtors. Payment of twenty (20%) percent of such claims is contemplated on the effective date, with the remaining eighty (80%) percent to be paid in quarterly payments extending over five years.

The Debtors' licenses with the Licensors are to be assumed, and the Licensors are to be paid their claims in full on the effective date.

The Debtors' report of plan voting, as supplemented, although not having been formally introduced into the record, indicates that all classes have accepted the Plan except the class including SPNB. SPNB, BEC, and the Licensors all filed Objections to confirmation of the Plan.

## D. DISCUSSION

### 1. THE SUCCESS POTENTIAL OF THE ORFA PRODUCT, THE HIGH CALIBRE OF THE PROPONENTS' PROPOSED MANAGEMENT TEAM, AND THE STRONG LIKELIHOOD THAT THE PROPONENTS CAN MARKET THE PRIVATE PLACEMENT RENDER THE PLAN FEASIBLE.

All three objecting parties—SPNB, BEC, and the Licensors—contend that the Plan fails to meet the "feasibility" requirement of 11 U.S.C. § 1129(a)(11), that confirmation is "not likely to be followed by liquidation, or the need for future financial reorganization, ..." Of the three, only SPNB levels an attack at the technological backbone of the Plan, i.e., that the Orfa process merits development. However, on February 28, 1988, SPNB agreed to advance as much as $13.55 million to build the Philadelphia plant and thereby promulgate the Orfa process. It own expert, Thomas Vence, a financial consultant who was involved in the process which led to the approval of the earlier loan, admitted that he did not question the viability of the technology behind the Orfa process.

The principal thrust of the criticisms of the technological feasibility of the Plan by SPNB emphasizes skepticism not with the process itself but with the facts that the Debtors' business has had little earning capacity in the past and that the Debtors have no outstanding written contracts by which they can generate the tipping fees and revenue from sales of the recycled end products which the Proponents' witnesses project will make its technology profitable in the future. The Philadelphia plant, built with SPNB's loan funds as a demonstration of the workability of the Orfa process, is of limited effectiveness due to defects in construction. Unless this plant is put into a better condition, the Proponents are capable of demonstrating only the Debtors' failure to transfer the Orfa process into a workable reality.

However, SPNB's purported contemporary skepticism is contrary to its own past behavior. In 1988, at a time when the Debtors' incumbent management, with a track record that all parties agree was unenviable, was in control, SPNB was willing to advance considerable funds to the Debtors. The Proponents are prepared to install, as President and Chief Executive Officer, Joseph G. Munisteri, who has a distinguished record in the engineering construction industry. Munisteri previously served as Chief Executive Officer and Board member of several engineering firms. Having testified at length in several hearings, Munisteri has impressed the court as knowledgeable and realistic in his assessment of the Debtors' prospects. He identified Lorin B. Ellison, a certified public accountant and previously Vice President of Finance of Bausch & Lomb, as the reorganized Debtors' proposed Secretary, Treasurer and Chief Financial Officer. The Board of Directors of the Debtors present-

ly includes William F. Ballhaus, former Chief Executive Officer of Beckman Instruments; John Dutton, Corsair's Director of Corporate Finance and Senior Vice President of a large healthcare company; and R. Eric Miller, former President for Fluor Constructors, Inc. and Vice President of Bechtel Corporation. Ballhaus testified in prior proceedings and Dutton testified in December proceedings. Both have been optimistic, yet are tempered with a sense of realism, about the Debtors' prospects. This constellation of individuals is a vast improvement over the group of "dreamers" who were the Debtors' principals when SPNB made its loan in 1988.

Munisteri, Dutton, and Alexander Cappello, EAFC's principal, acknowledged the basically inoperable status of the Debtors' Philadelphia plant. Their plan was to hire Fluor Daniel, Inc. and Thyssen AG., European companies of impeccable reputation, to repair and provide guarantees of the operation of the Philadelphia plant, at a cost of $4.5 million.

We accept Cappello's testimony that the private placement cannot be finalized until plan confirmation occurs. Unless the Chase loan materializes, the funds to repair the Philadelphia plant will therefore not appear until after the private placement is solicited. It is only after the repairs are made to the plant that it is realistic to expect contracts yielding tipping fees and end-product purchases to appear. This proposed progression of development of the Debtors by the Proponents appears reasonable. We accept the Proponents' assertions that it is unrealistic to expect definite commitments from investors and prospective customers at this juncture.

BEC and the Licensors voice little concern about the technology of the Orfa process. Indeed, BEC attempted several means of obtaining the Orfa license to incorporate it into a proposal for trash disposal in the City of Toronto, reflecting BEC's confidence in the efficacy of the process. Although the October 1, 1990, deadline by which BEC was compelled to make a presentation to the City of Toronto has passed, BEC has remained an active party in this case, either due to a hope that it can still compete in the Toronto process or a desire to develop the process in other Canadian municipalities. The Licensors of the process could hardly be expected to challenge its technological feasibility.

The thrust of the objection to feasibility from these parties is focused upon the use of the private placement as a means for raising capital. The effective date of the Plan is triggered by the Proponents' raising at least $7 million within 150 days after confirmation. The total debt of the three Debtors is $19.35 million, according to Dutton. The cost to repair the plan will be at least $4.5 million. Operating costs will result in a need for millions more, unless and until operations of the Debtors are profitable. The objectors are troubled because the Debtors have no funds and the Proponents themselves have insufficient resources to fund the plan. Moreover, the source of the funds is not a recognizable financial institution, but an unidentified, amorphous group of individuals who have not been identified and indeed could not be identified because they do not yet exist.

Cappello and Dutton are aware of these aspects (drawbacks, if you will) of the Plan. However, they point out that solicitation of investors is unrealistic and perhaps illegal unless it is first backed by a confirmation order. Cappello points to his Companies' past success in raising $22 million on the Debtors' behalf. These funds were raised at a time when the incumbent management was in control. They reason, not illogically, that investments will be more readily obtainable with their proposed competent management team in place.

The standards for determining plan feasibility are not rigorous. *See, e.g., In re Temple Zion,* 125 B.R. 910, 914–15 (Bankr. E.D.Pa.1991); *In re 222 Liberty Associates,* 108 B.R. 971, 985–86 (Bankr.E.D.Pa. 1990); *In re Orlando Investors, L.P.,* 103 B.R. 593, 600 (Bankr.E.D.Pa.1989); and 5 COLLIER ON BANKRUPTCY, ¶ 1129.-2(11), at 1129–36.11.

Caselaw has established that bankruptcy court[s] must consider several factors in making a feasibility determination: (1)

the adequacy of the debtor's capital structure; (2) the earning power of its business; (3) economic conditions; (4) the ability of the debtor's management; (5) the probability of the continuation of the same management; and (6) any other related matters which determine the prospects of a sufficiently successful operation to enable performance of the provisions of the plan. *See, e.g., 222 Liberty Associates,* 108 B.R. at 986; *In re Gulph Woods Corp.,* 84 B.R. 961, 973 (Bankr.E.D.Pa.1988), *aff'd,* C.A. No. 88–4081 (E.D.Pa. Feb. 24, 1989); and *In re Landmark at Plaza Park, Ltd.,* 7 B.R. 653, 659 (Bankr.D.N.J.1980).

*Temple Zion, supra,* 125 B.R. at 915.

The Proponents have made a very strong showing of the fourth factor referenced *supra.* Since the management team which has been proven unable to accomplish the end of making the Debtors profitable is now out of the picture, the absence of probability that the same management will continue constitutes a positive showing of the fifth factor referenced *supra.*

The second factor referenced above is another strong element in the Proponents' favor. The possible earning power of the Debtors' business is very high. The Debtors' technology is highly regarded. The issue of waste disposal is very important and the prospect of a recycling process is a very attractive prospect at this stage in the history of our planet. In an era when many Chapter 11 cases present real estate developments which often have no upward potential or businesses engaged in industries in which growth potential is neither present nor likely, these Debtors stand out as presenting a relatively high probability of increased future earning power.

The third factor noted *supra* is difficult to measure, but appears to be positive in light of the type of financial plan offered by the Proponents. Loans from recognizable lending institutions are presently very difficult to obtain. However, the climate for new investments is positive, especially since alternatives such as real estate trusts have become less attractive investments. A plan which proposes a sale of stock is one of the few means of raising capital which has at least the potential for success in the current financial environment. The fact that the Proponents are professionals in the investment field who have not been tainted by past transactions renders them capable candidates to put together a private placement which can succeed. We therefore would classify current economic conditions as conducive to the plan proposed.

The first factor of the facts recited above is, of course, not in the Proponents' favor. The Debtors have no capital at all, and the focus of the plan is to provide them with capital. However, we believe that the Proponents' prospect of achieving that end are relatively bright.

No other parties have materialized who have been willing to invest the time, energy, and financial resources into the development of the Debtors that the Proponents have. The Proponents appear to have two strong incentives for doing so: (1) to prevent a loss of their prior investments in this venture; and (2) to obtain placement fees and future financial advantages from being on the ground floor of the Debtors' new financial life. These incentives, though selfish, assure that their participation will be ongoing. They provide the sort of "other related matters" within the scope of the sixth factor cited *supra* which are properly to be considered in determining plan feasibility.

The Proponents cite *In re American Solar King Corp.,* 90 B.R. 808, 831–33 (Bankr.W.D.Texas 1988), as an example of a Chapter 11 case in which a plan based upon funding from new investments was deemed feasible and was confirmed. SPNB and BES are quick to point out the distinctions between the instant case and that case. In *American Solar King,* two large potential investors in the debtor's private placement were identified, whereas here we have only the investment brokers identified and the large body of investors are faceless. However, the overall picture presented by the Proponents compares favorably with that in *American Solar King.* The very Proponents of the Plan are invest-

ment brokers, who, as we noted, appear quite capable of accomplishing a successful placement.

We therefore conclude that the weight of the factors relevant to a feasibility analysis supports the conclusion that the Plan is feasible.

2. THE PLAN'S PROVISION FOR WHAT IS EFFECTIVELY A SUB-STANTIVE CONSOLIDATION OF THE THREE DEBTORS IS PERMISSIBLE, SINCE IT RESULTS IN NO HARM TO SPNB, THE ONLY CREDITOR OBJECTING THERE-TO.

█ The only party objecting to the Proponents' joinder of the three Debtors into the single Plan is SPNB. The basis of SPNB's quarrel with the effort of the Proponents to bring the Debtors together is articulated in *Orfa II,* 121 B.R. at 296. In addition to having a claim against ORFA-PHIL which is secured by the Philadelphia Plant, SPNB has an unsecured claim against ORFADEL arising from ORFA-DEL's guarantee of the debt of ORFA-PHIL to SPNB. ORFADEL owns the Debtors' licenses. In a liquidation of the Debtors, these licenses would yield at least some proceeds. Except for a relatively small secured claim of BEC, *see* pages 421–423 *infra,* ORFADEL's assets are not subject to security interests. Therefore, argues SPNB, ORFADEL's unsecured creditors, of which it is the largest by reason of its guarantee of ORFAPHIL's debt to SPNB, are adversely compromised by treatment identical with the treatment of unsecured creditors of one Debtor (OR-FAM) which is clearly insolvent, and another (ORFAPHIL) which may be insolvent.

However, the voting reports indicate that ORFADEL's unsecured creditors (other than SPNB) accepted the Plan. These creditors are apparently of the view that the chance of full payment proposed under the Plan is preferable to what they would receive if the licenses were liquidated.

The Debtors do not argue that SPNB is undersecured, but, rather, have always insisted that the Philadelphia plant is worth more, even if converted to a conventional solid-waste transfer station in a liquidation of the Debtor's assets, than the amount of SPNB's debt. The Plan contemplates full payment of SPNB's claim with interest. If SPNB's secured claim against ORFAPHIL is in fact liquidated under the terms of the Plan, as proposed, SPNB's contingent guarantee claim against ORFADEL would be liquidated as well. SPNB's claim against ORFADEL is therefore contingent only upon the failure of the Plan.

As it had in the context of the dispute over the presence of the single Creditors' Committee serving all three Debtors appointed by the United States Trustee, SPNB has placed itself in the awkward posture of arguing a cause for unsecured creditors of ORFADEL in which the "pure," non-contingent unsecured creditors of ORFADEL themselves apparently lack interest.

Consequently, we are inclined to view SPNB's advocacy on this issue as motivated principally by a desire to destroy the Plan, as we did its motivation in seeking appointment of alternative committees in *Orfa II,* 121 B.R. at 298, rather than motivated by a good faith concern that the effective consolidation effected by the joint Plan will unfairly prejudice its economic interests. This observation colors our analysis of the issue, as it did in *Orfa II, id.* at 298–99.

Irrespective of its substantive significance in these cases, which we suggest is nil, the consolidation issue presents several challenging legal issues. Both SPNB and the Proponents devote considerable portions of their respective Briefs to argument on this issue. While this court is ultimately able to allow the Plan to pass muster on this issue, principally *because* the significance to creditors is slight, the questions are close enough that we could picture another court's viewing their resolution differently. Since the Proponents will be obliged to prepare a further Amended Plan, they might consider measures which would avoid this problem, such as separate treatment of the creditors of each of the Debtors or possibly even separate Plans. The

substance of such changes would not appear to be very great.

Addressing the legal issue presented, we begin by noting that the Proponents are attempting to consolidate the Debtors' cases in a joint plan of reorganization without previously and successfully filing a separate motion to substantively consolidate the cases. The propriety of this method of effecting consolidation is supported by the decision in *In re Continental Vending Machine Corp.*, 517 F.2d 997, 999 (2d Cir. 1975), *cert. denied sub nom. James Talcott, Inc. v. Wharton*, 424 U.S. 913, 96 S.Ct. 1111, 47 L.Ed.2d 317 (1976). There, the court approved an amended reorganization plan proposed by the trustee in bankruptcy that called, for the first time, for a substantive consolidation of the debtors, a parent corporation and its subsidiary. Several bankruptcy commentators have cited the *Continental Vending Machine* decision in support of the proposition that substantive consolidation can be effected through a plan of reorganization. *See Comment, Substantive Consolidation in Bankruptcy: A Primer*, 43 VANDERBILT L.R. 207, 225, 239–40 (1990) (consolidation may be achieved by an express proposal in reorganization plan) (cited hereafter as "Comment"). *Accord*, B. WEINTRAUB & A. RESNICK, BANKRUPTCY LAW MANUAL, ¶ 8.16, at 8–77 (rev. ed. 1986).

However, in *In re Silver Falls Petroleum Corp.*, 55 B.R. 495, 497 (Bankr. S.D.Ohio 1985), the court addressed what it considered to be a question of first impression: whether the court could confirm a reorganization plan that, for the first time in the bankruptcy proceeding, proposed the substantive consolidation of the two debtors. The court rejected the plan on the ground that the debtors did not meet the burdens necessary to justify consolidation. *Id.* at 498. The court stated that the problems raised by the issue of whether consolidation could be effected in a plan were "novel" because the burden of proof shifted to the party proposing consolidation, instead of lying with the party objecting to a reorganization plan. *Id.* at 497. *But see*

*In re Richard Buick, Inc.*, 126 B.R. 840, 851 (Bankr.E.D.Pa.1991) (debtor always has burden of proving all elements of 11 U.S.C. § 1129 necessary to sustain an order of confirmation).

Other courts, while not expressly embracing the propriety of achieving substantive consolidation through a reorganization plan, have given tacit approval to this procedure. In *In re Apex Oil Co.*, 101 B.R. 92, 93 (Bankr.E.D.Mo.1989), the debtors filed a substantive consolidation motion, but, before the court set a hearing date on this motion, the debtor filed a reorganization plan that called for the consolidation of the debtors' estates. The court stated that, since the plan for reorganization requested consolidation, it was unnecessary to address the debtors' motion prior to plan approval. *Id.* at 94. *But cf. In re Texas Extrusion Corp.*, 68 B.R. 712, 722 (N.D.Tex.1986), *aff'd*, 836 F.2d 217 (5th Cir. 1988) (consolidation of bankruptcy cases through joint plan of reorganization without pleading, proof, or adequate findings under law to support substantive consolidation is prohibited).

We believe that the issue is one which often arises and is sanctioned by silence in furtherance of practical expediency. In *Orfa II*, 121 B.R. at 297–98, we referenced several well-known cases in which joint plans which informally resulted in substantive consolidations were allowed to go forward. We suspect that bankruptcy courts are rarely inclined to raise the issue of an improper, informal consolidation of cases when the creditors of all of the various debtors appear satisfied. *See Richard Buick, supra*, 126 B.R. at 846 (while bankruptcy courts have some level of duty to independently review Chapter 11 plans, a *sua sponte* detailed investigation of all aspects of a debtor's plan is not appropriate).

Passing from the procedural to the substantive issues raised by the Proponents' effort to achieve a substantive consolidation of the Debtors' three cases, we begin by observing that the Bankruptcy Code does not specifically authorize a court to grant consolidation. Instead, the court's power to substantively consolidate cases is

derived from its general equitable powers under 11 U.S.C. § 105. *See, e.g., In re Augie/Restivo Baking Co., Ltd.,* 860 F.2d 515, 518 (2d Cir.1988); *In re Murray Industries, Inc.,* 119 B.R. 820, 828 (Bankr. M.D.Fla.1990); Comment, *supra,* 43 VANDERBILT L.REV. at 210–11, 220–31. There is some question, however, as to what equitable purpose consolidation is to serve.

The Second Circuit has stated that the "sole purpose" of consolidation "is to ensure the equitable treatment of all creditors." *Augie/Restivo, supra,* 860 F.2d at 518. This view of consolidation appears to bar consolidation unless it benefits *all* creditors. The reasoning to support this conclusion is that, because of the dangers involved in forcing creditors of one debtor to share with creditors of a less solvent debtor, consolidation is a measure "vitally affecting substantive rights" that is "to be used sparingly." *Id.* at 518.

In contrast, the leading case in this district (and, apparently, this Circuit) concerning consolidation focused on the overall effect that a consolidation will have on a reorganization plan. In *In re F.A. Potts & Co.,* 23 B.R. 569, 572 (Bankr.E.D.Pa.1982), Chief Judge Twardowski adopted a two-part test in determining whether consolidation was appropriate:

1. The applicants must demonstrate that there is a necessity for substantive consolidation or a harm to be avoided by the use of the equitable remedy of substantive consolidation; and

2. The benefits of substantive consolidation must outweigh the harm to be caused to objecting creditors.

The debtors in *Potts* were a parent corporation and its wholly-owned subsidiary which, in addition to having the same board of directors, were essentially controlled by one person. *Id.* at 571. The court characterized the debtors as essentially "one operation." *Id.* The two companies had in the past lent substantial sums of money to each other, resulting, at the time of the bankruptcy filing, in a cash surplus in the subsidiary company and a severe cash shortage in the parent company. *Id.* at 572. The court found that the consolidation of the debtors' assets and liabilities alleviated the cash shortage problem of the parent company, and thus enabled the debtors' business operations to continue. *Id.* at 573.

The court concluded that its first articulated criterion for consolidation had been met, finding that "[t]hrough consolidation ... the assets of both debtors will be merged so that the cash can be used where it is needed most." *Id.* at 573. The court was also influenced by the fact that the debtors' ability to obtain adequate financing for their reorganization was substantially increased by consolidation. *Id.*

As to the second criteria, the court found that, because no creditors could prove that consolidation would harm their security interests, the benefits of consolidation outweighed any harm it might cause. *Id.* at 574. The court's final conclusion concerning the consolidation issue is indicative of how it viewed consolidation: "we believe that substantive consolidation will inure generally to the benefit of the debtors and their creditors alike by helping the debtors to operate more efficiently and to file a feasible consolidated plan of reorganization." *Id.*

In *Augie/Restivo, supra,* 860 F.2d at 518, the Second Circuit articulated a test involving two critical factors:

(i) whether creditors dealt with the entities as a single economic unit and "did not rely on their separate identity in extending credit;" or (ii) whether the affairs of the debtors are so entangled that consolidation will benefit all creditors.

Other courts have designated as many as seven factors which have been cited as factors to be considered in determination of a motion for consolidation:

(1) The presence or absence of consolidated financial statements;

(2) The unity of interest of and ownership between various corporate entities;

(3) existence of parent and intercorporate guarantees on loans;

(4) degree of difficulty in segregating and ascertaining individual assets and liabilities;

(5) existence of transfers of assets without formal observance of corporate formalities;

(6) commingling of assets; and

(7) profitability of consolidation at a single physical location.

See, e.g., Holywell Corp. v. Bank of New York, 59 B.R. 340, 347 (S.D.Fla.1986); Murray Industries, supra, 119 B.R. at 830; In re Gainesville P–H Properties, Inc., 106 B.R. 304, 305–06 (Bankr.M.D.Fla. 1989); In re Baker & Getty Financial Services, Inc., 78 B.R. 139, 142 (Bankr. N.D.Ohio 1987); In re Donut Queen, Ltd., 41 B.R. 706, 709 (Bankr.E.D.N.Y.1984); and Comment, supra, 43 VANDERBILT L.REV. at 215–16. However, the Comment notes that "the absence of one or more factors will not necessarily defeat a request for consolidation." Id. at 216–17. "When factors conflict or when critical factors are absent, courts determine whether the benefits of consolidation outweigh any detriment to objecting parties." Id. at 217, citing In re Auto–Train Corp., 810 F.2d 270, 276 (D.C.Cir.1987).

█ Arguing that this court should adopt the Augie/Restivo test and that the first factor cited by that court cuts in its favor, SPNB contends that it dealt with the three ORFA companies as separate entities, and relied upon the separate identity of ORFAPHIL and ORFADEL in extending credit. It claims that, because it did not feel that it had sufficient security for its loans to ORFAPHIL, it negotiated with ORFADEL separately in order to have recourse against ORFADEL's assets. However, the presence of inter-company guarantees, such as the one given to SPNB by ORFADEL on behalf of ORFAPHIL, are indicative of an interrelationship of companies within a larger enterprise, and negate the claim of separate reliance on creditors. (See pages 421–422 infra for instances of inter-company guarantees negotiated by ORFAM in favor of BEC).

The Proponents argue that the Debtors operated as a single entity, since they had common senior officers who were paid from one company (ORFAM), that all of these officers treated the three Debtors as one, and that the three debtors filed consolidated tax returns. There is authority for the principle that consolidation is appropriate when entities have a common office, where there is common ownership, where these are common employees, and where employees are paid by only one entity. See Gainesville P–H, supra, 106 B.R. at 304; Potts, supra, 23 B.R. at 571; and In re Richton Int'l Corp., 12 B.R. 555, 558 (Bankr.S.D.N.Y.1981).

The Proponents have not proven that the three Debtors' financial affairs are entangled. They have not shown that all of the creditors of the Debtors would benefit from consolidation. Yet, the record reveals that, except for SPNB, no creditors are troubled by the prospect of consolidation, and it appears that SPNB would suffer no detriment if the plan were consummated as proposed. See pages 416–417 infra.

There are obviously benefits to the Proponents served by the relative simplicity of consolidation of three cases and plans into one. They argue that a "free-flow of cash" among the three entities is beneficial to implementation of their plan. On the other hand, the detriment to creditors appears to be slight.

All of the seven factors cited at pages 414–415 supra are present except possibly a difficulty in separating the assets. However, all of the factors need not be present to justify consolidation. The benefits of convenience outweigh the complete lack of detriment to objecting creditors. The Potts test is entirely consistent with this approach and we believe that, when applied to the instant facts, warrants the degree of substantive consolidation sought by the instant Proponents.

There is an absence of actual prejudice to creditors, in contrast to the findings of the court in Augie/Restivo. In light of the "modern trend which is more liberal" in allowing consolidation, Murray Industries, supra, 119 B.R. at 828, there is little basis for denying consolidation in this context.

Effecting consolidation in the instant Plan's confirmation process does not present the procedural difficulties noted in *Auto–Train, supra,* 810 F.2d at 278–79. Putting consolidation at issue in the plan process places it before all of the Debtors' creditors for a vote, which is a more democratic process than deciding the issue by a motion which only the most powerful creditors are apt to address.

In *Auto–Train, supra,* and *In re Amereco Environmental Services, Inc.,* 125 B.R. 566, 568–69 (Bankr.W.D.Mo.1991) (which also involved debtors engaged in the waste-disposal industry), the courts had no difficulty allowing the debtors to consolidate, but refused to allow such an order to be effective *nunc pro tunc.* The Proponents seek no such dramatic relief. As we indicated at pages 408–409 *supra,* the instant Plan contemplates the re-vesting of each of the individual Debtors' respective assets in that entity post-petition. This is permissible, since "[s]ubstantive consolidation is not an absolute proposition." Comment, *supra,* 43 VANDERBILT L.REV. at 213.

Therefore, we find that the efforts of the Proponents to effect a substantive consolidation of the Debtors' cases does not warrant denial of confirmation of the Plan. Of course, we again caution the Proponents that this issue, like all of the problematical issues raised by the Objectors, can perhaps be eliminated in the process of preparing an Amended Plan. See pages 425–426 *infra.*

### 3. THE PROPONENTS' INCLUSION OF ALL OF SPNB'S CLAIMS IN A SINGLE CLASS IS PERMISSIBLE.

■ SPNB also argues that the Proponents' inclusion of its at least partially secured claim against ORFAPHIL in the same class with its totally unsecured claim against ORFADEL violates the requirement of 11 U.S.C. § 1122(a) that claims may be placed in a particular class only if they are "substantially similar to the other claims or interests of such class." Therefore, SPNB urges that its dissimilar claims *must* be classified separately.

We addressed the issue of classification of claims in *Richard Buick, supra,* 126 B.R. at 851–54; and *222 Liberty, supra,* 108 B.R. at 989–93. In those decisions, we emphasized that the classification itself was not nearly so significant as the consequence of disparate treatment of like or similar claims. *Id.* Therefore, in *Richard Buick,* we refused to allow the debtor to lump all of its secured claims into a single class in light of the very different security interests and different proposed treatments of these various interests proposed in the debtor's plan. *See* 126 B.R. at 853–55. On the other hand, in *222 Liberty,* we were not prepared to condemn the plan proponent's placement of the unsecured portion of a partially secured claim ("the deficiency claim") in a class separate from other unsecured claims. 108 B.R. at 989–90. However, we refused to countenance the disparate treatment of the deficiency claim in comparison to that provided to other unsecured claims. *Id.* at 990–93.

In the instant Plan, the Proponents propose to pay general unsecured creditors' claims in full, without interest, over a period of five years. However, they propose not only to pay SPNB's claims in full, but also to pay interest on these claims in addition. Therefore, SPNB can hardly argue that the Proponents are unfairly discriminating against its claims in their treatment of them.

This "preferred" treatment of all of SPNB's claims arises, of course, from the Proponents' apparent position that SPNB's claim against ORAPHIL is oversecured, and must be paid in full. SPNB's unsecured claim against ORFADEL is based exclusively on ORFADEL's guarantee of ORFAPHIL's liability to SPNB. If ORFAPHIL's liability is in fact paid in full, as the Proponents contemplate, SPNB's claim against ORFADEL will be wiped out. Although this treatment may therefore be less "preferential" than it appears at first, it is nevertheless scarcely the sort of detrimental treatment which led the plan proponents into difficulty in *Richard Buick* and *222 Liberty.*

Therefore, the practical effect of the Proponents' classification scheme here is very unlike that at issue in *In re Gulfco Inv. Corp.*, 593 F.2d 921 (10th Cir.1979), cited by SPNB for the proposition that its secured and undersecured claims must be classified separately in order to comply with § 1122(a). The consolidation of the claims in that case had the effect of reducing a secured creditor to the status of an unsecured creditor, thereby violating the absolute priority rule. *Id.* at 927. Furthermore, the debtor's consolidation of claims in *Gulfco* had the effect of destroying otherwise valid security, and was accomplished by labeling the entire secured claim as unsecured in order to avoid the difficulty of valuation of the security. *Id.* Unlike *Gulfco*, this case does not involve the end result of eliminating, or even reducing, a creditor's security to its detriment and to the benefit of other creditors.

*In re Gillette Associates, Ltd.*, 101 B.R. 866 (Bankr.N.D.Ohio 1989), also cited by SPNB, addresses the question of whether a debtor's plan should be denied confirmation because it classifies claims of bondholders and those of an indenture trustee together. The *Gillette* plan was held to improperly "lump ... together" inconsistent claims. *Id.* at 872–73.

However, at issue in this case are claims of SPNB the "legal character" of which are substantially identical, since they arise out of the same obligation. Furthermore, we can detect no motivation on the part of the Proponents to "gerrymander" different classes simply to obtain the vote of at least one impaired class in order to comply with 11 U.S.C. § 1129(a)(10), as in *In re LeBlanc*, 622 F.2d 872, 879 (5th Cir.1980). *Accord, In re U.S. Truck Co.*, 800 F.2d 581, 586 (6th Cir.1986). *But see 222 Liberty*, 108 B.R. at 990; and *In re Greystone III Joint Venture*, 102 B.R. 560, 568–69 (Bankr.W.D.Tex.1989) ("gerrymandering" to obtain compliance with § 1129(a)(10) may be acceptable as long as all similarly-situated claimants are treated the same). The Proponents have sufficient votes from the Plan's unsecured creditors and other impaired classes to satisfy the requirement of § 1129(a)(10).

We therefore refuse to deny confirmation on the basis of the Debtor's classification of all of SPNB's claims, secured and unsecured, together in a class by themselves.

4. WHILE WE FIND THAT THE DEGREE OF NEGATIVE AMORTIZATION OF SPNB'S LOAN CONTEMPLATED IN THE PLAN IS PERMISSIBLE, CONFIRMATION OF THE PLAN MUST BE DENIED BECAUSE THE PLAN CONTEMPLATES AN INTEREST RATE LOWER THAN TWO (2%) PERCENT ABOVE PRIME, WHICH THIS COURT DEEMS IS THE MINIMUM ALLOWABLE RATE IN THIS CONTEXT.

The Proponents have been unable to close the Chase loan despite having been accorded a five-month extension to do so by reason of the frustrated settlement negotiations before Judge Wizmur. Therefore, the Plan can only be analyzed under the alternative financing option, which contemplates the negative amortization of the SPNB debt for a ten-year period. In this option, interest on the SPNB debt is deferred for the first 30 months and is added to the principal amount of the loan. The Plan calls for the prime rate of interest to be applied to the deferred interest and the principal loan. The Plan also provides for a balloon payment at the end of the tenth year. The total amount due at the end of the tenth year is approximately $8,225,000, a figure which is higher than SPNB's final (and apparently unopposed) claims of $8,072,065.76.

Both parties compare the provisions of the Plan to the terms of the original loan agreement of February 28, 1988, which contained a 10–year loan by SPNB of a maximum of $13.55 million to ORFAPHIL. The original contract contains a negative amortization feature; however, the circumstances under which it was to be operational are the subject of a debate between the parties. The interest rate was the prime rate plus four (4%) percent.

SPNB, the sole member of an impaired class under the Plan, voted to reject the Plan. Therefore, the requirement set forth in 11 U.S.C. § 1129(a)(8) is not satisfied. If all of the other applicable requirements of § 1129(a) have been met, the Plan may still be confirmed, but only if it satisfies the requirements of §§ 1129(b)(1) and (b)(2). *Compare Richard Buick, supra,* 126 B.R. at 850.

Since the Objectors are secured creditors, the Debtor must satisfy one of the three alternative requirements of § 1129(b)(2)(A) for the Plan to be confirmable. The Proponents contend that the Plan satisfied § 1129(b)(2)(A)(i) and is, therefore, confirmable. Section 1129(b)(2)(A)(i) provides as follows:

> For the purpose of this subsection, the condition that a plan be fair and equitable with respect to a class includes the following requirements:
>
> (A) With respect to a class of secured claims, the plan provides—
>
> (i)(I) that the holders of such claims retain the liens securing such claims, whether the property subject to such liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims; and
>
> (II) that each holder of a claim of such class receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property;

Section 1129(b)(2)(A)(i) "specifically permits deferred payments." *222 Liberty, supra,* 108 B.R. at 994. The court in *In re Spanish Lake Associates,* 92 B.R. 875, 878–79 (Bankr.E.D.Mo.1988), noted that neither deferrals of principal and interest nor negative amortization are *per se* objectionable under § 1129(b)(2)(A)(i)(II). An objecting secured claimant receiving deferred cash payments in a plan of reorganization, is, however, entitled to "at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least

the value of such holder's interest in the estate's interest in such property." 11 U.S.C. § 1129(b)(2)(A)(i)(II). In other words, "the total payments must be equal to the present value of the secured claim." *In re Park Avenue Partners Limited Partnership,* 95 B.R. 605, 613 (Bankr. E.D.Wis.1988).

The court in *Spanish Lake, supra,* 92 B.R. at 878, sets forth five elements which a court must consider when presented with a plan proposing deferred principal and interest:

(1) The length of the post-confirmation deferral of interest,

(2) The amount of interest to be deferred after confirmation,

(3) The amount of principal and interest deferred and capitalized after confirmation,

(4) The ratio of debt to value of collateral during the term of the deferral, and

(5) The nature and quality of the collateral, including consideration of whether the value of the collateral is appreciating, depreciating or remaining relatively stable.

In *Spanish Lake,* the court refused to confirm a plan which proposed a deferral of interest and principal for seven years. *Id.* at 876–77. However, in *Spanish Lake,* the ratio of debt to the value of the collateral was "as high as" 86.5%, and the ability of the collateral to generate cash sufficient to fund the proposed plan was in doubt. *Id.* at 879.

In *222 Liberty, supra,* we rejected a plan that proposed a deferral of principal for 10 years, with interest for the initial 18 months to be paid at a below contract rate of 11% per annum. *Id.* at 994. However, there, the debt-to-collateral value ratio was over 100% and the quality and value of the collateral was very poor. *Id.* at 994–95.

In support of the instant Plan, the Proponents attempt to demonstrate the similarity between the proposed Plan payments and the terms of the original loan, citing *In re Sovereign Group,* Bankr. No. 89–10721F (Bankr.E.D.Pa. Oct. 17, 1989), as a case supporting their position. In *Sovereign Group,* Judge Fox of this court found that

the balloon payment and deferment of interest provisions in a plan corresponded with the original loan agreement between the creditor and debtor. However, nowhere in the *Sovereign Group* decision does Judge Fox indicate how much, or even if, this similarity influenced the court.

A case in which Judge Fox did address the issue of the similarities between the plan and the original payment terms between the Debtor and a secured creditor was *In re Executive House Associates,* Bankr. No. 88–10214F, slip op. at 8–12 (Bankr.E.D.Pa. July 6, 1989). In that case, Judge Fox considered that the original and the current lender was the United States Department of Housing and Urban Development ("HUD"), which has less borrowing costs than private lenders. Also, the court in *In re Club Associates,* 107 B.R. 385, 399 (Bankr.N.D.Ga.1989), indicated that the terms of the original loan are factors supporting a finding that particular payment terms are "fair and equitable" (proposed plan, concerning payments of a secured creditor whose original loan agreement with a debtor provided for negative amortization, is distinguishable from cases that found negative amortization inequitable because, in part, there was no corresponding negative amortization feature in the original loan agreement).

■ The existence of a negative amortization feature in the original loan supports the fairness of such payment terms in the Plan. The primary reason courts intensely scrutinize negative amortization relates to the notion that the creditor is, in effect, giving a coerced loan and is incurring the risks of negative amortization that it did not bargain for when initially lending the funds. However, when these risks were borne by the creditor in the initial loan, similar risks may not be so inequitable as to warrant refusal to permit such terms in a plan. *See id.* at 399–400.

In the instant case, however, it is unclear whether the negative amortization provided in the Plan resembles the terms of the 1988 SPNB loan to ORFAPHIL. The Proponents assert that the 1988 loan contained a provision that was "effectively a form of negative amortization." By way of contrast, SPNB contends that the negative amortization feature in the 1988 loan is substantively distinct from the Plan's terms, since it contained a quarterly reduction (as opposed to the Plan's annual reduction), and more importantly, was conditional subject to ORFAPHIL's satisfaction of certain requirements. The Proponents concede that the 1988 loan amortization is distinguishable, but argue that the plan's terms do not "unreasonably" extend the risks contemplated by SPNB.

■ In analyzing the fairness of interest deferment under § 1129(b), it is crucial to consider the amount of interest and capital to be deferred, the length of deferral, and the interest rate proposed. *See* B. Schermer & K. Bartz, *Negative Amortization and Plan Confirmation,* 8 BANKR.DEV.L.J. 1, 8–9 (1991) (referenced hereafter as "Schermer & Bartz"). The Plan proposes to defer interest for the first 30 months on the SPNB loan, a deferment of only twenty-five (25%) percent of the loan's total term. This does not appear to be excessive. *Compare Spanish Lake, supra,* 92 B.R. at 879 (deferral of interest at an accelerating rate over seven years is inequitable).

SPNB does not challenge the length nor the amount of the deferral. Instead, SPNB argues that the principal, after the deferral interest is added to it at the end of the 30–month period, will be $8.255 million at the end of the 10–year "loan," slightly more than the amount of its principal at the effective date of the Plan. In essence, SPNB feels that it will have to wait an unreasonably long period to receive payment.

The Proponents, meanwhile, contend that the $8.225 million balloon is not an unreasonably large figure, since it is less than sixty (60%) percent of the maximum amount of the original loan of $13.55 million. SPNB attempts to analogize this situation to the plans at issue in *In re D & F Construction,* 865 F.2d 673, 675 (5th Cir. 1989); and *222 Liberty, supra.* However, the facts of these cases are distinguishable. In *D & F,* the proposed plan delayed pay-

ment of the principal for 14 years and negatively amortized the interest for 12 years. 865 F.2d at 676. In *222 Liberty,* the secured creditor was grossly undersecured and its security was further jeopardized by a long delay in repayment. 108 B.R. at 995. By way of contrast, the proposed pay out is shorter than in *D & F* and, unlike the secured creditor in *222 Liberty,* SPNB is or is nearly a fully-secured creditor.

The quality of the collateral at issue is further enhanced by the reasonably bright prospects of the Proponents to achieve reorganization of the Debtors. We therefore cannot say that the amortization period proposed by the Plan is excessive in length. Thus, we conclude that most of the terms of the Plan do result in "fair and equitable" treatment of SPNB.

■ Although the rate of interest is not one of the five elements enumerated in *Spanish Lake,* Judge Schermer noted this to be a factor in determining the fairness of a negative amortization plan in his later article. *See* Schermer & Bartz, *supra,* 8 BANKR.DEV.L.J. at 10. The article lists several cases where plans did not meet the fair and equitable standard of § 1129(b) because of the inadequacy of the plan's interest rate, including *222 Liberty. Id.* at n. 50.

The main point of contention between the parties is the interest rate to be applied to the SPNB loan. SPNB asserts that, given the riskiness of the Plan, the rate should be "prime plus four (4%) percent, or at least thirteen (13%) percent." SPNB points to the Plan's proposal to pay Chase, on that prospective loan, the prime rate plus two (2%) percent as evidence that the proposed rate of the unadjusted prime rate is below the prevailing market rate.

The Plan offers to pay SPNB the prime rate of interest charged by Chase, which, as of December 19, 1990, was ten (10%) percent. In support of this, EAFC argues that the expert testimony of banker Leslie Brun at the hearing of December 19, 1990, established that the interest rate proposed in the Plan was fair. In addition, EAFC cites *In re Aztec Co.,* 107 B.R. 585, 588

(Bankr.M.D.Tenn.1989), for the proposition that we should use the "minimal sufficiency" standard to evaluate the rate of interest. However, in *Aztec,* the terms of the loan proposed in the plan, according to expert witnesses, were unique because no market existed for the loan proposed; thus, in the absence of a market, the prevailing market rate could not be determined. *Id.* at 588.

We found Brun to be a more convincing witness than the witnesses criticizing the interest rate proposed by the Plan, *i.e.,* Thomas Crosby, the SPNB loan officer presently in charge of this loan, and Michael France, a partner in an accounting and consulting firm who served as SPNB's expert witness. Brun is an experienced, disinterested banker who addressed the loan in issue in the detail befitting his profession. France was difficult to categorize professionally (he is not a lawyer nor an accountant nor a banker), and he was vague in his criticism of the terms of the Plan as "very very attractive amortization from a debtor prospective." He offered no alternative "fair" interest rate. Crosby spoke as one who probably opposed the loan to ORFAPHIL on any terms since its inception.

Nevertheless, we cannot totally accept Brun's assessment of the propriety of the Plan's interest rate. We are impressed with the fact that the Debtor, in the "real world" of finance, was willing to offer Chase an interest rate of two (2%) percent above prime, and yet Chase has chosen not to close the loan. Given the negative amortization of SPNB's claim under the Plan, and the significance of a fair interest rate as a factor necessary to justify any negative amortization, we conclude that the minimal interest rate allowable to render a Plan contemplating the treatment of SPNB in issue is two (2%) percent above the prime rate, which is a rate of about twelve (12%) percent per annum. *Compare In re Computer Optics, Inc.,* 126 B.R. 664, 670–73 (Bankr.D.N.H.1991) (rate of two (2%) percent above prime in plan found acceptable pursuant to reasoning that interest rate under § 1129(b)(2)(A) ought to consider the

contemporary time value of the funds deferred, not what a lender would charge for a "coerced loan"); *In re E.I. Parks No. 1 Ltd. Partnership*, 122 B.R. 549, 552–56 (Bankr.W.D.Ark.1990) (Treasury rate plus two (2%) percent risk factor, resulting in 10.5% deferral rate, is acceptable); *In re Sovereign Group 1985-27, Ltd.*, Bankr. No. 89–10721F, slip op. at 16 (Bankr. E.D.Pa. Feb. 28, 1990) (twelve (12%) percent interest "reflects market value to the degree that is possible"); *Club Associates, supra*, 107 B.R. at 402–04 (ten (10%) percent rate found acceptable, since it was higher than the original contract rate of 9.45%); *Executive House, supra*, slip op. at 8–12 (eleven (11%) percent rate found acceptable because it was less than HUD's borrowing cost); *In re Crane Automotive, Inc.*, 88 B.R. 81, 85 (Bankr.W.D.Pa.1988) (prime rate plus an additional two (2%) percent risk factor found acceptable); and *In re Edgewater Motel, Inc.*, 85 B.R. 989, 996 (Bankr.E.D.Tenn.1988) (twelve (12%) percent not proposed rate of nine (9%) percent, is appropriate where plan included significant negative amortization).

Since the Plan does not presently provide interest at the rate of two (2%) percent above prime, we are compelled to conclude that it is not "fair and equitable" as to SPNB at present and, for that reason, the Plan cannot be confirmed.

5. BEC IS ENTITLED TO HAVE BOTH OF ITS LOANS TO ORFAM CLASSIFIED AS SECURED CLAIMS, AND THEREFORE THE PROPONENTS' INCLUSION OF BEC'S CLAIMS IN A CLASS OF UNSECURED CLAIMS IS IMPROPER AND ALSO REQUIRES THAT CONFIRMATION BE DENIED.

■ We are now obliged to shift our focus from SPNB, the largest and most troublesome of the objectors, to BEC. Compared to SPNB's stance as a rather ordinary secured lender, BEC's relationship to these cases is rather unique.

BEC became involved in the Debtors' affairs because it was a potential user of ORFADEL's licenses, having a particular interest in obtaining licenses of the Orfa process in Toronto and ultimately other portions of Canada. At the outset of this case, BEC was positioned with EAFC as a frustrated investor that wished to dismiss the bankruptcy filing. When the dismissal attempt failed, BEC unsuccessfully attempted to acquire the Debtors' sublicenses through other means, *i.e.*, a purchase from the Trustee and then a rather underhanded effort to enforce an alleged assignment of an alleged Canadian sublease of the licenses in its name. EAFC regrouped as one of the Proponents, determined to prevent any party, most notably its old ally BEC, from separating the Debtors, in reorganization, from any of their valuable assets, including the licenses.

The Proponents not only answered the Complaint in the Adversary, but they also pleaded a counterclaim against BEC, on behalf of the Debtors, for violation of an alleged contractual agreement to continue funding the Debtors. The claims, of which BEC seeks a determination under 11 U.S.C. § 506(a), (d), arise out of funding provided by BEC to the Debtors.[1]

The first of the loans in issue was made on September 28, 1989, in the amount of $500,000, to ORFAM, evidenced by a Promissory Note executed in BEC's favor by ORFAM. The total amount of the claim based upon this obligation, including interest at twelve (12%) percent per annum, is $533,041.

Thereafter, the parties negotiated financing arrangements set forth in the letter

---

**1.** There is, however, a fundamental lack of logic to the proceeding. BEC claims that it has filed, or will amend its several proofs of claim already filed, to state secured proofs of claim for the amounts in issue. There has been no objections filed to any of its proofs of claim. Therefore, these claims would be deemed allowed as filed. 11 U.S.C. § 502(a). Perhaps BEC was motivated to initiate this proceeding because the Proponents argued that the security interests asserted by BEC, though legitimate, were, in effect practically worthless. *See* pages 422–423 *infra*. Perhaps it was believed necessary to reemphasize its status as a secured creditor. In any event, the prospect of a § 506 complaint filed by a creditor is most unusual and tolerated here mainly because of a lack of objection to this procedure.

agreement of December 13, 1989, at which time the second loan was made. Pursuant to the letter agreement, a private placement by EAFC of several million dollars was contemplated. This placement was never made due to the dispute which arose shortly thereafter between the incumbent management of the Debtors on one hand, and EAFC and BEC on the other hand. *See Orfa I,* 115 B.R. at 801–03, 808–09.

In the interim, until the private placement could be arranged, EAFC promised to attempt to obtain bridge loans of up to $2.5 million for working capital. BEC agreed to and did make a first loan, on the terms set forth in the letter agreement, in the principal amount of $50,000, concurrently with the execution of the agreement on December 13, 1989. Subject to the conditions set forth in the letter agreement, BEC was to make, periodically, fifty (50%) percent of the aggregate principal amount of the bridge loans, and EAFC was to use its best efforts to procure the balance, up to the maximum aggregate principal amount of $2.5 million.

Pursuant to the letter agreement, all of the bridge loans, including the September, 1989, loan, were to be guaranteed by OR-FADEL and ORFAPHIL. ORFAM also committed its subsidiaries to execute a Stock Pledge Agreement pursuant to which the bridge loans would be secured by all of the outstanding shares of capital stock of ORFADEL, all of which were owned by ORFAM.

From December 13, 1989, through March 19, 1990, BEC advanced the aggregate principal sum of $500,000 to ORFAM pursuant to the terms of the letter agreement. Prepetition interest on these advances at the prescribed rate of twelve (12%) percent, to March 20, 1990, the date of the bankruptcy filing, amounts to $9,760.

ORFADEL did in fact execute the promised Guaranty Agreement. Therein, it granted to BEC and EAFC a security interest in all of its rights under the licenses.

The letter agreement also included a commitment of ORFAM to grant BEC an exclusive sublicense to operate Orfa plants in Canada. However, this Canadian sublicense was never executed.

At an earlier date, ORFADEL granted sublicenses of its licenses for Canada to ORFA Recycling Systems, Inc. ("ORS"), a Canadian corporation. ORFAM owns all of the stock of ORFADEL. ORFADEL owns eighty-five (85%) percent of the stock of ORS.

In Adv. 90–753, the Debtors' common Trustee, ROBERT S. TAYLOR, sought to enjoin BEC from attempting to execute upon and sell (in all probability, to itself) the interests of ORS in its Canadian sublicenses in execution upon its rights under the Promissory Note without first seeking and obtaining relief from the automatic stay in either the ORFADEL or ORFAM bankruptcy cases. On October 10, 1990, we issued a Memorandum and Order preliminarily enjoining this effort of BEC, and ultimately we entered a Final Order of November 15, 1990, in that proceeding to the same effect. We reasoned that ORFADEL, although apparently having granted Canadian sub-licenses to ORS, retained property interests in the sub-licenses. Since BEC was attempting to effect a transfer of interests in the sub-licenses, which were easily the most valuable property in its estate, to itself, we concluded that BEC's actions violated 11 U.S.C. § 362(a)(3). *See, e.g., MacArthur Co. v. Johns–Manville Corp.,* 837 F.2d 89, 91–93 (2nd Cir.), *cert. denied,* 488 U.S. 868, 109 S.Ct. 176, 102 L.Ed.2d 145 (1988); *In re 48th St. Steakhouse, Inc.,* 835 F.2d 427, 430–31 (2d Cir.1987), *cert. denied sub nom. Rockefeller Group, Inc. v. 48th St. Steakhouse, Inc.,* 485 U.S. 1035, 108 S.Ct. 1596, 99 L.Ed.2d 910 (1988); *A.H. Robins Co. v. Piccinin,* 788 F.2d 994, 998–1003 (4th Cir.), *cert. denied,* 479 U.S. 876, 107 S.Ct. 251, 93 L.Ed.2d 177 (1986); *In re Capodanno,* 83 B.R. 285, 288–89 (Bankr.E.D.Pa.1988); *In re Black,* 58 B.R. 60, 61–62 (Bankr.E.D.Pa. 1986) and *In re Golden Plan of California, Inc.,* 39 B.R. 551, 555 (Bankr.E.D.Cal. 1984), *on remand after order vacated,* 72 B.R. 205 (Bankr.E.D.Cal.1986).

Alternatively, we held that these circumstances constituted an appropriate instance

in which to invoke 11 U.S.C. § 105(a) to extend, to no more than a slight degree, the normal scope of the automatic stay to the interest of ORS, though not a debtor, in the licenses, under the criteria set forth in *In re University Medical Center*, 82 B.R. 754, 757 (Bankr.E.D.Pa.1988); and *In re Monroe Well Service, Inc.*, 67 B.R. 746, 752–53 (Bankr.E.D.Pa.1986). *Cf. MacArthur, supra*, 837 F.2d at 93–94; *A.H. Robins, supra*, 788 F.2d at 1003; and *In re Metro Transportation Co.*, 64 B.R. 968, 973–74 (Bankr.E.D.Pa.1986).

Although we reaffirm the correctness of our decisions in Adv. 90–753, especially in light of the fact that the Debtors' full ownership of the licenses is crucial to effectuation of the Plan, we must conclude that BEC's claim arising out of the September, 1989, Promissory Note is secured by ORS's interests in the licenses. Therefore, it is clear that both of BEC's claims are secured: the September, 1989, obligation is secured by ORS's interests in ORFADEL's licenses, and the December, 1989, bridge loan is secured by ORFADEL's stock.

In its recently-filed letter in response to BEC's Brief in support of the relief sought in the Adversary, the Proponents refer us to portions of their original Brief, in which they defended their classification of BEC's claims as unsecured because the ORFADEL stock is allegedly worthless.

Firstly, we note that this argument addresses only the security interest of BEC in the ORFADEL stock arising out of the December, 1989, bridge loan. It does not address the security interest which BEC holds in the licenses arising out of the September, 1989, loan. Although we reaffirm our decision that BEC has no Canadian sub-licenses of its own and that it must obtain relief from the stay to proceed to execute against ORS's sub-licenses, these conclusions do not adversely affect BEC's security interest in those sub-licenses arising out of the terms of the pledge included in the Promissory Note.

Secondly, as BEC points out in its Brief, the Proponents' argument overlooks the fact that, in a § 506(a) determination, a court must value the creditor's interest in the estate's interest in the secured property as of the date of confirmation of the plan, taking into account the disposition and use of the property articulated in the debtor's plan. *See In re Balbus*, 933 F.2d 246, 21 B.C.D. 1188, 1191–92 (4th Cir.1991); *In re 222 Liberty Associates*, 105 B.R. 798, 804 (Bankr.E.D.Pa.1989); *In re Mays*, 85 B.R. 955, 963–64 (Bankr.E.D.Pa.), *aff'd*, C.A. No. 88–4306, 1988 WL 81716 (E.D.Pa. August 1, 1988); *In re Blakey*, 76 B.R. 465, 468–69, *modified on other grounds*, 78 B.R. 435 (Bankr.E.D.Pa.1987); and *In re Lopez*, 75 B.R. 961, 962–964 (Bankr.E.D.Pa.1987), *aff'd*, 82 B.R. 712 (E.D.Pa.1988).

The Plan, if effectuated, would not leave ORFADEL valueless and insolvent. Therefore, we disagree with the Proponents' contention that this security interest is worthless. We therefore conclude that BEC has two valid secured claims against the Debtors.

The Proponents also argue that the only evidence that these security interests have been perfected is the testimony of BEC's principal, who is a Canadian attorney, Wolf von Teichman, at the October 5, 1990, hearing in Adv. 90–753. While documentary support for von Teichman's opinion would have been much more convincing, we conclude that, in the absence of contrary evidence, this testimony is, at least on this record, sufficient to establish perfection.

To complete the discussion of the Adversary, we note that the Proponents produced no evidence in support of their counterclaims at the trial of the matter, relying upon documentary evidence and the cross-examination of von Teichman in support of same. This slim presentation of evidence fails to establish either that BEC breached a duty to continue funding the Debtors or that the Debtors suffered any damages as a proximate cause thereof. As the recitation of events in *Orfa I*, 115 B.R. at 801–02, 808–09, makes clear, the period of the Debtors' history between December, 1989, and March, 1990, was extremely tumultuous, with accusations and counter-accusations of wrongdoings flying in all directions. BEC and EAFC were, at that juncture, perceived to be in the same camp,

and therefore it is difficult to conceive of how BEC alone, apart from EAFC, could have wronged the Debtors.

As the counterclaim plaintiffs, the burden of proof was upon the Proponents to establish the substance of their claims of BEC's liability to the Debtors *and* to convince us that they were entitled to damages as a proximate cause thereof by a preponderance of all of the competent evidence produced. *See, e.g., Compagnie Des Bauxites de Guinee v. Insurance Co. of N. America,* 551 F.Supp. 1239, 1242–43 (W.D.Pa.1982); *In re Fricker,* 116 B.R. 431, 437–38 (Bankr.E.D.Pa.1990); *In re Lewis,* 80 B.R. 39, 41 (Bankr.E.D.Pa.1987); and *In re Flick,* 14 B.R. 912, 914–15 (Bankr.E.D.Pa.1981). The Proponents have failed to meet their burdens of proof as to either liability or damages, and therefore judgment must be entered against them on their counterclaims.

■ Since we have concluded that BEC holds two separate secured claims against ORFADEL, albeit secured by different collateral, we must conclude that Class H of the Plan, which places secured creditors and unsecured creditors together in a single class, violates the principles of 11 U.S.C. § 1122(a). Our prior discussion on the issue of classification led us to conclude that plan classification is a flexible process which could justify combining secured and unsecured claims of a single creditor arising from the same obligation in a single class. *See* pages 416–417 *supra.*

However, with reference to the Plan's treatment of BEC's claims, the Plan purports to include two separate secured claims of one creditor within a class which includes a residuum of other unsecured creditors. Clearly, many, if not all, of the claims in Class H arise from entirely different types of obligations than the obligations which are the bases of BEC's claims.

In *Richard Buick, supra,* 126 B.R. at 852–55, we found the placement of different secured creditors holding totally different security interests in a single class to be violative of § 1122(a). It therefore follows that the Proponents' attempt to mix se-

cured claims with a class of general unsecured claims is improper and is a sufficient basis for denial of confirmation.

It is true that, unlike the plan at issue in *Richard Buick,* the instant Plan contemplates basically the same treatment of unsecured claims as it does secured claims, *i.e.,* all will be paid one hundred (100%) percent of their claims in the long run. For this reason, the issue of BEC's secured status is not critical to the success of the Plan and this may explain the Proponents' rather phlegmatic response to the Adversary.

■ However, secured status would possibly entitle BEC to post-petition interest on its claims and additional rights in the event of a cramdown. *See* 11 U.S.C. § 1129(b)(2)(A), quoted in part at page 418 *supra.* Those rights cannot be eliminated through the medium of classification. Even a proponent of a plan contemplating a one hundred (100%) percent payout to all creditors must classify totally different types of claims in different classes, rather than presenting a plan which provides but a single class of "creditors."

Accordingly, the Proponents must reclassify BEC's claims, since they are found by us to be secured, if they wish to produce a confirmable plan.

6. THE PLAN MUST PROVIDE FOR PAYMENT OF ALL SUMS NECESSARY TO CURE THE DEBTORS' DEFAULTS TO THE LICENSORS, INCLUDING ANY DAMAGES PROVEN DUE TO THE LICENSORS IN ADDITION TO UNPAID LICENSE FEES.

■ The Licensors, in addition to raising objections based upon lack of feasibility, protest that the Plan, though contemplating a cure of the ORFADEL's defaults in payments due under its License Agreements with them, fails to provide for submission of liquidated damages for late payments and interest to them which is also called for by the parties' License Agreements. The Plan provides that any claims in Class D, which includes the Li-

censors' claims, shall be paid in full on the effective date, which appears to contemplate payment of all sums due to the Licensor. However, figures quoted to the Licensors by the Proponents apparently suggested to the Licensors that the Proponents intended to pay them only the monetary defaults under the Agreements.

■ To the extent that the Licensors contend that 11 U.S.C. § 365(b)(1) provides that they are entitled to damages as well as payment of defaults as an element of a "cure," they are correct. *See In re Joshua Slocum, Ltd.*, 103 B.R. 601, 605 (Bankr. E.D.Pa.1989). However, we do note that burden of proving their entitlement to damages is on the Licensors. *Id.* Elements of damages which are classified as penalties, such as late charges which excessively compensate an obligee to an executory contract beyond its actual damages, are unenforceable. *See id.* at 605–10; and *In re Jordan*, 91 B.R. 673, 678–81 (Bankr. E.D.Pa.1988).

Arguably, the Plan does provide that the Licensors will receive everything to which they are entitled under 11 U.S.C. § 365(b). However, it might be advisable for the Proponents to resolve any potential defect regarding the assumption of the invaluable License Agreements by clarifying the Plan to provide that the Licensors are entitled to both a cure and actual damages proved by the Licensors to be compensable in light of the Debtors' defaults.

7. THE PLAN IS OBVIOUSLY SUSCEPTIBLE TO AMENDMENTS WHICH MAY RENDER IT CONFIRMABLE, REQUIRING THAT THE RENEWED 362 MOTION, THE CONVERSION MOTION, AND THE BEC MOTION NOT BE GRANTED AT THIS TIME.

■ Throughout the period between late January and early June, 1991, when the parties were engaged in what we hoped would result in a consensual plan of reorganization of the Debtors, the Proponents refrained from amending the Plan. At recent conferences, the motivation for this lack of action, even in the face of what

must have been increasing knowledge of what SPNB would find at least palatable in a cramdown situation, was articulated by the Proponents as a desire to await this decision to make any amendments, which the Proponents hoped would provide them with a "road-map" to confirmation.

We can commend such an approach to production of a confirmable plan only with certain caveats. The goal of confirmation should be reaching a compromise negotiated among the parties. Requiring judicial intervention in such a multi-faceted phenomenon as the Chapter 11 plan confirmation process is risky business. A judge will make decisions based on the law as he perceives it. The judge's requisite distance from relevant facts not divulged in the courtroom prevents a judge from being totally sensitive to very pertinent business realities. Moreover, while a bankruptcy judge may be inclined to produce his personal road map to confirmation, appellate judges may close outmoded highways or build new bridges, making the bankruptcy judge's road map outdated and perhaps a worse guidepost than no road map at all.

In the context of this case, this court, for what it is worth, has identified only a few provisions of the Plan, which require what we would classify as tinkering, in order for the Proponents to prepare a plan acceptable to this court. A higher interest rate must be paid to SPNB, which basically will require the Proponents to merely recite a somewhat higher level of use of mostly other people's money which they will realize from their proposed private placement. BEC's claims will have to be put into a separate class or classes, and BEC will perhaps have to be paid slightly more. The Licensors may have to be paid slightly more. In the context of the Plan at issue, all of these changes will be relatively painless to the Proponents. Certainly, the Proponents are quite capable of correcting the flaws identified and producing a plan confirmable, at least by this court.

That being so, it would be inappropriate for this court to grant SPNB's Conversion Motion or its Renewal 362 Motion, and end the reorganization efforts at this time; or

to grant BEC's Motion and let it sever the invaluable licenses from the Debtors' estates at this juncture. In our Order of February 21, 1991, we reasoned that the imminent prospect of a successful reorganization precluded such relief. *See In re Franklin Pembroke Venture II,* 105 B.R. 276, 278 (Bankr.E.D.Pa.1989). The long, unsuccessful attempt at achievement of a consensual plan has not shaken the conclusions which we expressed in the February 21, 1991, Order. The fact that SPNB and BEC were apparently close to a resolution with the Proponents and not only abided but actively welcomed this long period of negotiation fortified our belief that the Proponents' Plan was realistic. The Debtors have assets of real value if they are properly developed and marketed. No other interested party has emerged with an alternative or competing plan during the long hiatus of the case. The Proponents' prospects of achieving a successful reorganization of the Debtors is brighter than ever.

Therefore, like the plan proponents in, *e.g., Richard Buick, supra,* 126 B.R. at 854–55; *In re Northgate Terrace Apartments, Ltd.,* 126 B.R. 762 (Bankr.S.D.Ohio 1991) (plan proponent permitted additional opportunity to confirm plan even though it failed to meet court's deadlines for doing so); and *Executive House, supra,* at (debtor's fifth amended plan, conceived two drafts after the third amended plan which was at issue on July 6, 1989, was confirmed on January 17, 1990), the instant Proponents deserve at least one more chance. However, we will condition the continuation of the stay on the Proponents' prompt preparation and presentment to this court of a successor-plan. *Compare 222 Liberty, supra,* 108 B.R. at 997–98 (debtor precluded from filing an *eighth* amended plan pending the opposing several creditors' ultimately-successful efforts to confirm a competing plan).

### E.  CONCLUSION

An Order consistent with the conclusions reached in this Opinion will be entered.

### ORDER

AND NOW, this 2nd day of July, 1991, upon consideration of evidence presented at hearings of August 30, 1990; September 12, 1990; September 28, 1990; October 5, 1990; November 14, 1990; December 19–21, 1990: February 27, 1991; and June 5, 1991, in reference to (1) confirmation of the Second Amended Consolidated Plan of Reorganization ("the Plan") filed by Euro American Financial Corp. ("EAFC") and Corsair Asset Management, Inc. ("Corsair") (collectively "the Plan Proponents" or "the Proponents"); (2) the above-captioned adversary proceeding, instituted by Bruce Energy Centre, Inc. ("BEC") pursuant to 11 U.S.C. § 506 to determining the nature and extent of its claim; (3) the Motion of BEC for relief from the automatic stay ("the BEC Motion"); (4) the Renewed Motion of Security Pacific National Bank ("SPNB") for relief from the stay ("the Renewed 362 Motion"); and (5) the Motion of SPNB to convert this case to Chapter 7 ("the Conversion Motion"), and upon consideration of the numerous submissions of the parties relevant thereto, it is hereby ORDERED AND DECREED as follows:

1.  Judgment is entered in favor of BEC and against Defendants ORFA CORP. OF AMERICA ("ORFAM"), ORFA CORPORATION OF AMERICA (DELAWARE) ("ORFADEL"), ORFA CORPORATION OF PHILADELPHIA ("ORFAPHIL"), ROBERT S. TAYLOR, TRUSTEE, EURO AMERICAN FINANCIAL CORPORATION ("EAFC"), EURO AMERICAN CAPITAL CORPORATION, and CORSAIR ASSET MANAGEMENT, INC. ("Corsair") in Adversary No. 90–0954S on the Counterclaim of the Proponents and in most of the claims set forth therein, as indicated *infra.*

2.  BEC's claim against ORFAM in reference to its Bridge Loans to ORFAM dated December 13, 1989, is allowed as a claim secured by all of the issued and outstanding shares of capital stock of ORFADEL, which stock is property of the estate of ORFAM, in the amount of $509,760, plus any post-petition interest, attorneys' fees,

and costs deemed due under 11 U.S.C. § 506(b).

3. BEC's claim against ORFADEL based on a Guaranty Agreement dated December 13, 1989, is allowed as an unsecured claim without priority in the amount of $509,760.

4. BEC's claim against ORFAM based on the September, 1989, Promissory Note is allowed as a claim secured by the rights of ORFA Recycling Systems, Inc. under the Canadian sublicenses for the ORFA and Jetzer processes, in the amount of $533,041, plus any post-petition interest, attorneys' fees, and costs deemed due under 11 U.S.C. § 506(b).

5. BEC's claim against ORFADEL based on the Pledge Agreement dated September 22, 1989, is allowed as an unsecured claim without priority in the amount of $533,041.

6. Confirmation of the Second Amended Plan of Reorganization submitted by the Proponents is DENIED.

7. Continued denial of relief pursuant to the Conversion Motion, the Renewed 362 Motion, and the BEC Motion is conditioned upon the filing of a Third Amended Plan and an accompanying Amended Disclosure Statement by the Proponents or any other interested party, in conformity with the accompanying Opinion, serving black-lined copies of same upon counsel appearing on the attached Mailing List, and notifying all interested parties of the filing of the Amended Disclosure Statement on or before July 18, 1991.

8. A hearing on the further Amended Disclosure Statement and to determine whether the Conversion Motion, the Renewed 362 Motion, and/or the BEC Motion should be granted at that time is scheduled on

WEDNESDAY, AUGUST 14, 1991, AT 9:30 A.M. and shall be held in Courtroom No. 2 (Room 3718), United States Court House, 601 Market Street, Philadelphia, PA 19106.